## STATE v. SHOCKLEY.

No. 1581.   (80 Pac. 865).

1. CRIMINAL LAW—HOMICIDE—CITY COURT—JURISDICTION—COMMITTING MAGISTRATES—CONSTITUTIONAL LAW.—Constitution, article 8, section 1, provides that the judicial power shall be vested in the Senate sitting as a court of impeachment, in a Supreme Court in district courts, in justices of the peace, and in such other courts inferior to the Supreme Court as may be established by law. Section 21 provides that the judges of the Supreme Court, district courts, and justices of the peace may hold preliminary examinations in cases of felony. Session Laws 1901, page 113, chapter 109, section 14, provides that the city court shall have original jurisdiction of cases arising under any city ordinances, and shall have the same powers as justices of the peace in all other criminal actions, and the judges of said courts shall be magistrates with all

powers and jurisdiction of the justices of the peace as magistrates. *Held,* that said section 14, in so far as it confers jurisdiction on the judges of said city court to act as committing magistrates, is not in conflict with said section 21 of the Constitution.

2. SAME—ABANDONMENT OF INTENTION.—Where one makes an unprovoked assault on another to commit a felony, the assailant, before he can claim the right of self-defense, must in good faith abandon his criminal design and withdraw from the contest, and notify his adversary of such abandonment so as to manifest his good faith and to remove all just apprehension in the mind of the party assaulted that such withdrawal may be only a ruse to gain some undue advantage and again renew the assault.

3. SAME—SELF-DEFENSE.—Defendant, in a prosecution for murder, entered a street car for the purpose of robbery and covered deceased and another with his gun, and ordered them to "put up their hands." Deceased thereupon told defendant to "put up his hands," at the same time drawing his own gun, on which defendant started to back out of the car, but fell near the door, firing a shot at deceased as he and his companion rushed towards him. In the scuffle ensuing, deceased attempted to shoot defendant, and was shot by defendant. The latter testified that he intended to shoot him in the arm only, to disarm him, but the gun was jarred in the fracas. *Held,* that on the issue as to whether defendant was entitled to a charge on the question of abandonment and self-defense, so long as he kept his gun in his hand, prepared to shoot, deceased and his companion were neither expected nor required to accept any act or statement of his as an intent to discontinue the assault and surrender himself as a prisoner.

4. SAME—ARRESTS BY PRIVATE PERSON.—Revised Statutes 1898, section 4638, provides that a private person may arrest another "for a public offense committed or attempted in his presence." *Held* that, when deceased stated to defendant that "he had better put up his hands," it was the duty of the latter to throw down his gun and surrender himself as a prisoner.

5. SAME.—Under said section, deceased and his companion had a right to use whatever force was necessary to disarm defendant and prevent his escape.

6. SAME.—The same rule did not govern, under the facts, that applies to parties engaged in mutual combat, or one that arises from a sudden quarrel or heat of passion, wherein both parties may be at fault, and where, after the aggressor has in good faith withdrawn from the combat, the party assailed is not justified in pursuing him for the purpose of continuing the affray.

7. SAME.—When defendant was told to put up his hands, he was in effect placed under arrest.

8. SAME—ABANDONMENT.—Defendant, after killing deceased, said to the latter's companion, "For God's sake, man! don't kill me; I will give up," but nevertheless shot him. It was not shown that the companion had made any statement or move that would justify an inference that he had in his possession a deadly weapon or intended to use one on defendant. *Held* that, even if the latter's statement had been made in good faith, it would avail him nothing under the circumstances.

9. SAME—EVIDENCE—While defendant was not on trial for the killing of the companion, yet, as the entire affray was one continuous transaction, it was proper to refer to the shooting of the latter to show defendant's state of mind, and, in the language of the statute, to show the "abandoned and malignant heart" of defendant.

10. SAME.—Under the evidence, there was not a moment from the time the defendant entered the car and told the occupants to throw up their hands, and until he killed deceased's companion, that either deceased or his companion would not have been justified in shooting defendant down for the protection of their own persons and lives, and to prevent his escape.

11. SAME—INSTRUCTION.—Defendant further testified that up to the time he fell there was nothing done or stated to cause him to abandon the thought of taking the money from deceased and his companion. *Held*, that under the evidence defendant was not entitled to an instruction on the question of abandonment and right of self-defense.

12. SAME—EVIDENCE—INCRIMINATING QUESTION.—In a criminal prosecution, the general rule is that the right to refuse to answer incriminating questions is a personal privilege of the witness, which he can either exercise or waive, and, if the witness chooses to answer incriminating questions, neither defendant nor his counsel can legally object.

13. SAME—PERSONAL PRIVILEGE—EXERCISE OF THROUGH COUNSEL. Under Constitution, article 1, section 12, providing that in criminal prosecutions the accused shall have the right "to appear and defend in person and by counsel" and "to testify in his own behalf," where the witness is also the defendant in the case he need not personally make the objection and claim his privilege from questions asked respecting the commission of other crimes by him, on the ground that such questions are incriminating, but may claim his immunity through his counsel. [1]

14. SAME—EVIDENCE—CREDIBILITY.—Where defendant in a criminal prosecution testifies in his own behalf, it is an abuse of discretion to permit the state, over his objection, to interrogate him respect-

---

[1] People v. Larsen, 10 Utah 143, 37 Pac. 258.

ing the commission of other crimes by him which are in no way con-- nected with the one for which he is being tried, unless the questions asked relate to some crime or crimes for which he has been convicted, and then only for the purpose of affecting the credibility of the witness.

15. SAME—EVIDENCE—ABANDONMENT.—In a proscution for murder, committed during an attempt by defendant to hold up and rob deceased, declarations of defendant to the effect that when he started for the scene of the crime, and when he arrived there, he had a mental reservation in respect to killing deceased, were not proof of a subscquent abandonment on his part.

16. SAME.—In a prosecution for murder, committed during an attempt by defendant to hold up and rob deceased, defendant's evidence *held* not to tend to show any intention of a subsequent abandonment on his part.

17. SAME—EVIDENCE—REVERSIBLE ERROR.—Revised Statutes 1898, section 4162, provides that every person guilty of murder in the first degree shall suffer death or, upon the recommendation of the jury, may be imprisoned for life in the discretion of the court. In a prosecution for murder, where the state depended almost entirely on defendant's confession for conviction, defendant, on direct examination, gave a detailed account of his actions leading up to the commission of the crime, but did not testify in relation to his past life, nor introduce any evidence bearing thereon, nor respecting his reputation for peace and quietness, or otherwise put his character in issue. *Held*, that it was reversible error to permit the state, over defendant's objections, to question him, on cross-examination, respecting the commission by him of other crimes in no wise connected with the crime for which he was on trial, the evidence thus sought to be elicited in no way tending to prove any issue, fact, or circumstance in the case, or tending to impeach or discredit any material part of defendant's testimony.

(Decided April 14, 1905).

APPEAL from District Court, Salt Lake County; C. W. Morse, Judge.

James Shockley was convicted of murder, and appeals.

REVERSED.

*H. A. Smith* for appellant.

*M. A. Breeden,* Attorney-General, for respondent.

## STATEMENT OF FACTS.

The defendant was convicted of the crime of murder in the first degree for the killing of one Amasa L. Gleason, and was sentenced to be executed. Defendant is the only living eye-witness to the tragedy, and the facts and circumstances leading up to and surrounding the commission of the crime, as testified to by himself, are as follows: On January 6, 1904, he went to the corner of Thirteenth and Second South streets, Salt Lake City, Utah, for the purpose of "holding up" a street car and robbing the employees of the street car company who were in charge of the car. He said, quoting his own language as shown by the record: "On the night of the 6th I left my room near 11:20; . . . went to the scene of the hold-up. . . . I went up to the car; looked through the east windows at the motorman and conductor. The men were standing near each other at the north end of the car. The larger man had something in his hand, a book or transfer slip, or something; it was Mr. Brighton. Gleason was standing near him; the men were talking. I went into the car; started toward where the men were. They did not look around until I was probably a couple of steps in the car; I walked nine or ten feet in the car when the men looked around; they first noticed me when I took two steps. The gun was in my hand in this position. I told them to put up their hands. The larger man put up his hands. The small man, Mr. Gleason, said: 'You had better hold up your hands.' Those were the very words he said; he spoke in a very calm manner. I realized then if I continued there might be a chance of hurting them, so I started back out of the car; put my gun down by my side, thinking they would know by that movement that I intended to leave. When I was a couple of feet from the door, for some reason—I do not know whether it was the snow being balled upon my heels, or what it was—I went to turn; my feet slipped, and I went down. There was nothing said or done by the men up until this time except as I have stated; there was nothing done or said to cause me to abandon the thought of taking the money from these men. . . . The two

men started toward me as soon as they saw me down in this position. As soon as they made a rush for me I fired a shot. I do not know where it went to. That was the first shot fired, and must have been fired in the direction of the door. I fired the shot thinking the men would stop and would not kill me, for I had seen the small man take a gun. Where he took it from I do not know; I saw it in his hands as he started. As soon as the shot was fired the men almost fell over me. It wasn't very clear, just exactly, all that happened during the excitement, but as near as I remember the large man (Brighton) took hold of me with the back of my coat and hold of one arm. I knew when I saw the gun in that man's hand he intended to shoot me. . . . I finally succeeded in getting on my feet. . . . Gleason at the time, had stepped back with his gun and taken it in both hands; I presume he was trying to get it to work; I did not know the cause it didn't fire I knew he attempted to fire, and it wouldn't fire. . . . I had the gun up in that shape, and then was when the thought entered my mind, if I could hit this man's arm it would likely prevent him from firing; so I started to pull down with the gun with the intention of trying to hit his arm, and, at the same time that I started to pull down with the gun, the large man, Mr. Brighton, I presume took hold of me, . . . jerking me back a little bit. . . . With the movement that caused him to jerk me back he threw his right hand around my head, . . . reached across and grabbed my arm below the elbow with his left hand at the same instant that he jerked me back, and then was when the gun was discharged. . . . I dont know positively which shot hit Gleason as I have claimed all along. . . . I didn't know the shot was going to be fired at that time; I didn't do it voluntarily; I didn't know whether he was hit or not; I didn't know that I had hit Gleason until I read the papers next morning. . . . As soon as I felt the gun explode I wrenched lose from Mr. Brighton and tried to go out of the door. Then Mr. Brighton got between me and the door, . . . and I reached up with my left hand and tried to turn him around like; . . . he grabbed me, as near as I can

remember, by this coat sleeve with his right hand. . . . and began to reach under his coat, and then it was that I did manage to say—I said it clearly; I know the man heard me— I said: 'For God's sake man don't kill me; I will give up'; and he never made any answer whatever, but continued to keep his hand under there. . . . Well, I suppose Mr. Brighton and I was scuffling; in fact, I would not have fired at Mr. Brighton until I had seen his gun, but I thought very likely this other man, Mr. Gleason, was right behind with his gun ready to shoot me in the back of the head. . . . Q. Now, what did Mr. Brighton do when you shot at him? A. Well he seemed to just stand still and let loose of me with his right hand; seemed to just stand still; then I brushed by him and got out of the car." Defendant further stated: "It is clear everything was done very quick; great excitement; . . . that the shooting of Gleason was wholly accidental." Defendant also testified as follows: "Q. Now Mr. Shockley, at the time, at or near the time, did you make any effort to speak to these men? A. I did. I did when they first took hold of me. Q. What did you say, or try to say, as near as you can remember? A. Well, I tried to tell them when he (referring to Gleason) started to put the gun down, I tried to tell him not to kill me. I was willing to give up to him, and, as to whether I made it clear or not, I don't know; I know I tried and stuttered considerably. . . . Q. Now, I will ask you to state, Mr. Shockley, whether or not you were willing, at every moment of the time after you started to back out, after the men started after you, until you left that car, to give up and let those men take you? A. I was willing, sir, they should take me a prisoner if they had said anything that indicated that was their intention, rather than have shot a man. Q. Did they make any remarks to you in any way asking you to give up, or you were a prisoner, or under arrest? A. Nothing whatever; there was no remarks except the smaller man (Gleason) saying, 'You had better put up your hands.'" The defendant also made a voluntary written confession, which was introduced by the State in evidence, which was substantially the same as his oral testimony. A preliminary

examination was had before the judge of the city court, and the defendant bound over to the district court. A trial was had in the last named court, which resulted in the conviction of the defendant of murder as hereinbefore stated. From the judgment rendered on this verdict defendant has appealed to this court.

McCARTY, J.,

After stating the facts, delivered the opinion of the court.

Appellant contends that the judge of the city court had no jurisdiction to act as a committing magistrate, and therefore the district court was without jurisdiction to try the case. The constitutional and statutory provisions bearing upon this question are as follows: Section 1, article 8, Constitution provides that:

"The judicial power of the State shall be vested in the Senate sitting as a court of impeachment in a Supreme Court, in district courts, in justices of the peace and in such other courts inferior to the Supreme Court as may be established by law."

Section 21 provides that the "judges of the Supreme Court, district courts and justices of the peace shall be conservators of the peace and may hold preliminary examinations in cases of felony."

Section 14, chapter 109, page 113, session laws 1901, provides that:

"The city court shall have original jurisdiction of cases arising under or by reason of the violation of any city ordinances, and shall have the same powers and jurisdictions as justices of the peace in all other criminal actions, and the judges of said courts shall be magistrates with all powers and jurisdiction of the justices of the peace as magistrates."

It is conceded that under and by virtue of said section 1, Constitution, the Legislature had authority to create the city

court, but it is contended that the foregoing provision of the statute, so far as it attempts to confer jurisdiction upon the judge of said court to act as a committing magistrate, is in conflict with said section 21 of the Constitution. Counsel for appellant insists that the word "may" in section 21 should be construed to mean "shall," and, when so construed, the doctrine of *expressio unius est exclusio alterius* applies, which, they claim, limits the jurisdiction to hold preliminary examinations in cases of felony exclusively to the officers mentioned in said section. By a careful reading of this section of the Constitution it at once becomes apparent that such could not have been the intention of the framers of that instrument. The section provides that the officers therein mentioned "shall be conservators of the peace and may hold preliminary examinations." It will be observed that its provisions impose upon such officers two separate and distinct classes of duties. In the first place, circumstances might arise where it may become necessary for them to perform duties of peace officers, and, second, might be expedient and necessary to act in their judicial capacity as committing magistrates. It is plain, however, that, if the maxim referred to governs in the construction of the language investing them with judicial powers, it must also control in the construction of the language which makes them peace officers. Now, if this rule of construction is to obtain in the case, it would necessarily follow that the "judges of the Supreme Court, district courts and justices of the peace," and they only, to the exclusion of all other officers, could lawfully act as conservators of the peace, and it would therefore devolve upon these three classes of officials to police the entire State of Utah. Neither sheriffs nor policemen would have the authority, when the peace and tranquility of the public is menaced or disturbed, or lives and property of citizens endangered by unlawful and riotous assemblies, to disperse the offenders or make arrests. For the word "conservator," when used and associated as it is here, has a clear and well-defined meaning Webster defines it as "an officer who has charge of pre-

serving the peace, as a justice or sheriff." Bouvier defines the term as "he who hath an especial charge, by virtue of his office, to see that the King's peace is kept." (Bouv. L. Dict., 401.) In 8 Cyc. 586, conservators of the peace are defined as "common-law officers whose duties, as such, were to prevent and arrest for breaches of the peace in their presence." It must be apparent that, if the construction contended for by appellant should be followed, not only would it devolve upon the officers mentioned in said section to preserve the public peace throughout the State, but, in many cases, they would be forced to perform the functions of bailiffs and ministerial officers in the courts over which they presided. It is plain that a construction which woud lead to such mischievous and absurd results cannot be seriously considered, where, as in this case, such consequences can be avoided by giving to the language of the provision of the Constitution under consideration its plain and ordinary meaning. (Suth. Stat. Con., sec. 238; Endlich, Inter. Stat., 258.) The first part of section 21, which provides that certain officers "shall be conservators of the peace," is imperative; that is, in cases of breach of public peace committed in their presence it would be their duty, if the exigencies of the occasion required, to take such steps and adopt such measures as, in their judgment, would be necessary to quiet the disturbance and preserve the public peace. The latter part of the section, which provides that they may hold preliminary examinations in cases of felony, imports an authority to do so, but does not impose a positive duty in this respect. Therefore it is evident that the words "shall" and "may" are used advisedly, and each is to be understood in its usual and ordinary sense. For it is a familiar rule of constitutional and statutory construction that words and phrases are to be given their general and popular meaning, unless the context or the nature of the subject otherwise indicate. (8 Cyc., 732, and cases cited in note; Black, Inter. Laws, p. 28; Suth. Stat. Con., Sec. 732.) Endlich, in his work on the Interpretation of Statutes (section 507), states the rule as follows:

"Indeed, the language of the Constitution, owing its whole force to its ratification by the people, is always to be taken in its common acceptation—its plain, ordinary, natural, untechnical sense—unless the very nature of the subject indicates, or the context suggests, that it was used in its technical sense. It must also be presumed that the people who who adopted the Constitution understood the force and extent of the language used, and that the language has been employed with sufficient precision to convey the intent. It follows that, where the words of the constitutional provision, taken in their ordinary sense and in the order of their grammatical arrangement, embody a definite meaning, which involves no absurdity or conflict with other parts of the same instrument, the meaning thus apparent on the face of the provision is the only one that can be presumed to have been intended, and there is no room for construction."

By adherence to this rule in the construction of the provisions last referred to of the Constitution, we not only give to the language used its plain and ordinary meaning, but avoid the absurdities and mischievous consequences heretofore pointed out which would inevitably result should we adopt the construction contended for by appellant. We fail to discover any conflict whatever, either in letter or spirit, between the provisions of the Constitution referred to and the provisions of the act creating city courts and defining their jurisdiction.

The defence requested the court to give the jury the following instruction: "If you find from the evidence that Mr. Gleason was shot by the defendant after the attempt to rob had been voluntarily and in good faith abandoned by the defendant, and that Gleason was not at that time in danger of being robbed, and by the conduct of defendant Mr. Gleason understood these facts, and that if Mr. Gleason afterwards assaulted the defendant in such a way as to induce in the de-

fendant a reasonable belief that he was actually in danger of great bodily harm or of being killed, and if you believe that Mr. Gleason had his gun in his hand or hands, and was working with it, and the defendant had reason to believe, and did believe, that Mr. Gleason intended to renew the attack upon him for the purpose of doing him great bodily harm or killing him, then the defendant would be justified in cocking his revolver and preparing to shoot Mr. Gleason in the arm for the purpose of preventing such great bodily harm or killing; and if, while his gun was so cocked and in his hand, the gun in the hands of the defendant was accidentally discharged, either from the conduct of Mr. Brighton or from any other cause, and Mr. Gleason was killed thereby, then the defendant would not be guilty of murder in the first degree." The court refused to give this instruction and others of like import asked for by defendant. Neither did the court refer to the question of abandonment and self-defense in its instructions to the jury. Counsel for defendant contend that there is evidence in the record which tends to show that when Gleason refused to comply with his command to "put up his hands," and assumed an attitude of resistance and showed a determination to resist force with force, he, the defendant, abandoned his intent to commit robbery and withdrew from the contest which he, by his own criminal act, had precipitated, and that the court erred in refusing to instruct the jury on the question of abandonment and right of self-defense as requested. We have made a thorough and critical examination of the record in this case and have failed to find any evidence whatever upon which an instruction on the question of abandonment and right of self-defense could properly have been predicated. We have in substance quoted all the evidence bearing on this question, and it conclusively shows that the actions of the defendant, from the time he entered the car for the purpose of robbery and until the homicide of Brighton, all constituted one continuous transaction. According to his own testimony, he entered the street car for the purpose of robbery, and, in pursuance and in the attempt thereof, ordered Gleason and Brighton to "put up their

hands," which Gleason refused to do, but told defendant to "put up his hands," at the same time drawing his own revolver. Defendant, on seeing the pistol in Gleason's hands, started to back out of the car. When near the door he fell, and Gleason and Brighton rushed toward him. When he saw them coming he fired a shot from his gun, but did not know whether it hit Gleason or not. Brighton and Gleason both took hold of defendant while he was down. Gleason had hold of him with one hand, and in the other hand his gun, which he tried to fire at defendant, but for some cause it would not go off. Gleason let go of defendant and stepped back, and with both hands tried to fire his pistol at him. Defendant, as he says, believing that Gleason was trying to kill him, raised his gun to fire at and hit his (Gleason's) arm, but in the scuffle the gun, when it was fired, had been brought in a more direct range of Gleason's body. After firing this shot defendant endeavored to leave the car, but Brighton, who had hold of him, stood between him and the door. Brighton at this juncture put one of his arms under his coat, and defendant, as he says, believing that by this move he was attempting to draw a gun, shot and killed him, and then left the car. He also testified that when he was down he tried to tell Gleason and Brighton that he was willing to surrender, but did not know whether or not he made himself understood. The law is well settled that where a party makes an unprovoked assault on another for the purpose of committing a felony, as was done in this case, before the assailant can claim or exercise the right of self-defense, he must in good faith abandon his criminal design and withdraw from the contest, and at the same time notify his adversary of such abandonment in such a way as to manifest his good faith and to remove all just apprehension there may be in the mind of the party assaulted that such withdrawal may be only a ruse for the purpose of enabling the assailant to gain some undue advantage and again renew the assault. And in this case a much stronger reason exists for the application of this rule than usually obtains in other cases of criminal assault. For it is a matter of common knowledge that, when a party

assaults another for the purpose of robbery, he does so with
the premeditated design of killing his victim should it be-
come necessary to do so in order to accomplish the robbery,
make good his escape, or to protect his person when being at-
tacked by the victim in resisting such attempted robbery. And
the Legislature, recognizing such to be the case, incorporated
into the Penal Code, among other things, the following pro-
vision: "Every murder committed in the perpetration of
robbery is murder in the first degree." (Section 4161, Rev.
St. 1898.) When the defendant covered Gleason and
Brighton with his revolver and ordered them to put up their
hands, they had a right to presume, and to act upon such pre-
sumption, that in case either of them failed to comply with
his demand he would do precisely what he did do, viz., shoot
them down. And, so long as he kept his gun in his hand pre-
pared to shoot, they were neither expected nor required to
construe and accept any act or statement of his as an intent
on his part to discontinue the assault and surrender himself
as a prisoner. That he had at no time after Gleason told him
he had better put up his hands intended to drop his gun and
surrender himself as a prisoner, the only legal thing left for
him to do under the circumstances, is made plain by his own
testimony: "I didn't say a word when Gleason told me to
put up my hands; I didn't think it necessary to drop my gun,
because at that time the men had made no movement; I did
just like any other human being would when I thought I was
going to lose my life: . . . I did not voluntarily drop the
gun under the circumstances, and no other man under God's
sun would; I knew I needed the gun; my life depended upon
it." And again he says: "A man going to perpetrate a
hold-up would think he was going to get away; I suppose
he would use every protection he could to get away." In the
case of *State v. Smith,* 10 Nev. 106, the court, in discussing
the question, said:

> "A man who assails another with a deadly weap-
> on cannot kill his adversary in self-defense until
> he has fairly notified him by his conduct that he
> has abandoned the contest, and, if the circum-

stances are such that he cannot so notify him, it is his fault, and he must take the consequences."

In the case of *People v. Button,* (Cal.) 39 Pac. 1073, 28 L. R. A. 591, 46 Am. St. Rep. 259, it is also said:

"In order for an assailant to justify the killing of his adversary, he must not only endeavor to really and in good faith withdraw from the combat, but he must make known his intentions to his adversary. His secret intentions to withdraw amount to nothing. They furnish no guide for his antagonist's future conduct. They indicate in no way that the assault may not be repeated, and afford no assurance to the party assailed that the need of defense is gone."

And again, in the same opinion:

"It is therefore made plain that knowledge of the withdrawal of the assailant in good faith from the combat must be brought home to the assailed. He must be notified in some way that danger no longer threatens him, and that all fear of further harm is groundless."

In 25 Am. and Eng. Encyc. L., 270, the rule is stated as follows:

"While he remains in the conflict, to whatever extremity he may be reduced, he cannot be excused for taking the life of his antagonist to save his own. In such a case it may be rightfully and truthfully said that he brought the necessity upon himself by his own criminal conduct."

And again it is said, on page 271:

"If the circumstances are such, arising either from the condition of his adversary, caused by the aggressor's acts during the affray, or from the suddenness of the counter attack, that the original assailant cannot so notify his adversary, it is such assailant's fault, and he must take the consequences." (1 McClain, Crim. Law, secs. 309,

310; *Stoffer v. State*, 15 Ohio St. 47, 86 Am. Dec.
470; *State v. Rogers,* 18 Kan. 78, 26 Am. Rep.
754; *Parker v. State,* 88 Ala. 4, 7 South. 98; *Carpenter v. State*, 62 Ark. 306, 36 S. W. 900; *People v. Robertson,* 67 Cal. 646, 8 Pac. 600; *Smith v. State,* 73 Ga. 79.)

Section 4638, Revised Statutes 1898, provides that a private person may arrest another "for a public offense committed or attempted in his presence." Therefore, when Gleason stated to defendant that "he had better put up his hands," it was his duty to throw down his gun and surrender himself as a prisoner. And Gleason and Brighton, under the foregoing provision of the statute, had a right to use whatever force was necessary to disarm him and prevent his escape. The same rule does not govern in this case that applies to parties engaged in a mutual combat, or one that arises from a sudden quarrel or heat of passion, wherein both parties may be at fault. In such a case the aggressor, if he can do so, may in good faith withdraw from the combat and place of encounter, and, if he does, the party assailed is not justified in pursuing him for the purpose of continuing the affray. In this case the defendant was acting in the role of an outlaw and hold-up. He was endeavoring to, and in fact was in the act of, robbing a couple of blameless and inoffensive men, and, when he was told to put up his hands, he was in effect placed under arrest; and the killing of these men, under the circumstances as related by himself in order to make his escape, was just as culpable and indefensible as though he had, without warning, shot them down when he first entered the car. At no time from the moment he entered until he fired the fatal shot that killed Gleason did he do anything that would even suggest that he intended in good faith to withdraw from the contest, much less abandon his felonious attempt of robbery or surrender himself as a prisoner. True, according to his testimony, which, for the purpose of this case, we must accept as true, after he had shot Gleason he said to Brighton, "For God's sake man! don't kill me; I will give up." When he made this statement he had already committed the crime

for which he stands convicted. And, even if this declaration had been made in good faith, under the circumstances it would avail him nothing. Brighton had made no statement or move, so far as shown by the record, that would even justify and inference he had in his possession a deadly weapon or intended to use one upon defendant, notwithstanding, under the circumstances, he had a perfect right to use whatever force was necessary to overcome defendant's resistance, even to the taking of his life. While the defendant is not on trial for the killing of Brighton, yet, as the entire affray was one continuous transaction, it is proper to refer to the shooting of Brighton for the purpose of showing the state of mind of the defendant and illustrating the circumstance and cause of shooting of Gleason, and, in the language of the statute, of showing the "abandoned and malignant heart" of the defendant.

In concluding the discussion of this branch of the case, we have no hesitancy in saying that, according to defendant's own testimony, which, as hereinbefore stated, we must assume to be true, from the time he entered the car and told the occupants to throw up their hands, and until he killed Brighton, there was not a moment that either Gleason or Brighton would not have been justified in shooting him down—first, for the protection of their own persons and lives; and, second, to prevent his escape. And there is an entire absence of testimony that would even tend to suggest that he, at any time after the affray began, ceased to be the aggressor. This is conclusively shown by his testimony, wherein he stated, referring to the time he slipped and fell: "There was nothing said or done by the men up until this time, except as I have stated; there was nothing done or stated to cause me to abandon the thought of taking the money from these men." In reading the record, one looks in vain to find any evidence that prior to the shooting of Gleason the defendant gave notice of any kind of any intention of abandoning his attempted robbery or of ceasing from his felonious assault. The instructions asked for by the defendant were therefore properly refused.

The defendant was sworn as a witness, and testified in his own behalf. On direct examination he stated that he was twenty-six years of age; that he was born in the State of Missouri, and that his father, mother, and two sisters reside there; that he purchased the revolver in Idaho with which he did the killing; and that he arrived in Salt Lake City January 2, 1904. He then gave a detailed account of his actions leading up to the commission of the crime. He did not testify in relation to, nor did he introduce any evidence bearing upon his past life. Neither did he introduce any evidence respecting his reputation for peace and quietness, or otherwise put his character in issue. On cross-examination the defendant was asked the following question: "Q. Did you hold up a street car in this city last July, 1903 ?" Counsel for "the defendant objects to this question and the evidence proposed to be adduced thereby, on the ground that it is incompetent, irrelevant, and immaterial to affect the credibility of the witness, and for every other purpose; that it is not proper cross-examination; and that it tends to incriminate the defendant." Hereupon the jury were excused from the courtroom to enable counsel to argue the matter: "H. A. Smith (defendant's counsel): The defendant joins with his attorneys in making this objection: he joins in the objection, and claims it is privileged. District Attorney: I think the defendant should make his claim in front of the jury when the defendant was asked the question, and I object to the record showing what is not a fact. The Court: The record will merely show the statement made by counsel. Mr. Smith: I will ask Mr. Shockley if he joins with me in that objection? District Attorney: I object to it; no jury present. The Court: You need not ask the defendant any question in the absence of the jury. Mr. Smith: I didn't think there was any question, but the defendant had the right to refuse to answer any question that would incriminate him, except the matter in issue. The Court: If the defendant had made that objection. I don't think counsel can make the objection." Whereupon the jury returned into the court-room. "The Court: In view of the suggestions that have been made,

the court will inform you, Mr. Shockley, that you are not re-quired to give any answer which would tend to subject you to punishment for a felony." Thereupon counsel for defend-ant renewed his objection as before stated; and also asked the defendant whether or not "you join with me in making that objection, and whether you don't make it yourself." "The Witness: I do make the objection myself. District At-torney: Just a moment! Now I object to the question. This defendant has got certain privileges which he must claim himself, which the Supreme Court has distinctly said his counsel cannot claim for him. The Court: Mr. Shockley, under the instructions given you by the court, do you claim that privilege and decline to answer the question on that ground—that it tends to incriminate you, and subject you to punishment for felony? The Witness: I decline to answer the question upon that ground. District Attorney: Upon the ground it tends to incriminate you? Mr. Smith: We ob-ject to it, if your honor please. The Court: Yes, that is suf-ficient on that subject. District Attorney: Mr. Shockley, didn't you last July, at South Temple and Thirteenth East street, hold up a street car and rob the motorman and conduc-tor, or either of them? Mr. Smith: We make the same ob-jection, if your honor please. The Court: The objection is overruled. District Attorney: Answer the question. Mr. Smith: Wait a minute. The court will inform the witness. The Court: If he sees fit to decline to answer these questions, he has a perfect right to do it, under the instructions of the court. Answer the question, unless you decline to. The Wit-ness: I decline to answer the question on the same grounds. The Court: You are excused from answering it. District Attorney: Mr. Shockley, didn't you, in this city, last July, hold up a street car on Douglas Line and attempt to rob the conductor or the motorman, or both, at Thirteenth East and about Fifth South? The Witness: I decline to answer. Dis-trict Attorney: On the ground that it would tend to incrimi-nate you? Mr. Smith: I object to that, if your honor please. Witness has stated the ground. The Court: Yes, on the same ground. District Attorney: Didn't you, last July,

Shockley, at Tenth East and Fifth South, shoot at a motor-man or conductor, or street car, a car running, a car up on the Fort Douglas Line ? The Witness: I decline to answer the question, sir, upon the same ground as before." The question was also asked the defendant if he had not deserted from the United States army, and, against the objection of his counsel, was required to answer the question, and answered that he did so desert. The action of the court in the above rulings is now here complained of as error.

The first question presented by this assignment of error is, was it incumbent upon the defendant to personally make the objections and claim his privilege from answering the questions asked respecting the commission of other crimes by him, or did he have the right to make his objections and claim his privilege and immunity through his counsel ? The general rule is that the right to refuse to answer incriminating questions is a personal privilege of the witness, which he can either exercise or waive. And the authorities all agree that, if the witness chooses to answer incriminating questions, neither the defendant nor his counsel can legally object. But we do not understand the authorities to hold that, when the witness is also the defendant in the case, his counsel cannot speak for him and make the proper objections and protect him in his right and immunity from answering questions on cross-examination respecting the commission by him of other crimes which are in no way connected with the one for which he is on trial. We have been able to find but three cases which go to the extent of holding that, when a defendant takes the witness stand in his own behalf, he, for the time being, in effect ceases to be a defendant, and forfeits his constitutional right to the assistance of counsel. The first case is that of the *State v. Wentworth*, 65 Me. 234, 20 Am. Rep. 688, and the court, in that case, bases its conclusions upon certain New York cases cited in the opinion. It will be seen by an examination of those cases that the question as to whether the defendant can speak through his counsel and claim his immunity from answering incriminative questions was not before the court in either of them. The New York court in a later decision (*People v.*

*Brown,* 72 N. Y. 571, 28 Am. Rep. 183), has passed upon this identical question, and Chief Justice Church, speaking for the court, says:

"I understand it to be conceded by the counsel for the people that this objection would be valid if it had been taken by the witness himself instead of the counsel. . . . Such is the rule as to a witness who is not himself a party. It is then a question between the witness and the court, with which the party has nothing to do, and with which counsel of the party has no right to interfere. . . . But when the witness is also the party, I see no reason for the application of this rule. By taking the stand as a witness, while he may subject himself to the rules applicable to other witnesses, he is not thereby deprived of his rights as a party; and it follows that his counsel, while he is in the witness box, has a right to speak for him, and that an error committed by the court against him may inure to his benefit as a party. Especially ought this protection to be afforded to persons on trial for criminal offenses, who often, by a species of moral compulsion, are forced upon the stand as witnesses, and, being there, are obliged to run the gauntlet of their whole lives on cross-examination, and every immorality, vice, or crime of which they may have been guilty, or suspected of being guilty, is brought out, ostensibly to affect credibility, but practically used to produce a conviction for the particular offense for which the accused is being tried, upon evidence which otherwise would be deemed insufficient. Such a result is manifestly unjust, and every protection should be afforded to guard against it. I am of opinion that the witness was privileged from answering the question, and that the objection was well taken by his counsel, and that the exception is available to him. Neither in the *Brandon Case,* 42 N. Y. 265, nor in

the *Connors Case,* 50 N. Y. 240, was the question
of privilege presented."

The two New York cases mentioned in the opinion just
quoted are the cases cited in the case of the *State v. Went-
worth,* supra. The next case is that of the *People v. Larsen,*
10 Utah 143, 37 Pac. 258, which is cited and relied upon by
the Attorney General as decisive of this question. In that
case the defendant, who had testified as a witness in his own
behalf, was asked on cross-examination the following ques-
tion: "Have you ever been arrested for a crime similar to
this?" The court, in the course of the opinion, says: "In
this case the question was not claimed by the witness to be
privileged. It was simply objected to by counsel as immater-
ial, irrelevant, and not cross-examination. Nor did it imply
an answer which would prove a link in a chain of testimony
and render it sufficient to convict him of crime. Nor would
it be criminative evidence at all." It will thus be observed
that the question now under discussion was not in any sense
at all before the court. Therefore while the expressions of
the court on this question in that case are entitled to respect-
ful consideration, they cannot be regarded as a precedent by
which this court must be bound in this and other like cases,
should any arise. The only other case we have been able to
find in which this doctrine is announced is the case of the
*State v. Kent,* 5 N. D. 516, 67 N. W. 1052, 35 L. R. A. 518.
By an examination of that case it will be seen that on the
cross-examination of the defendant he was questioned about
the commission of other crimes by him, for the purpose of
showing a motive for the commission of the crime for which
he was on trial. To this course of examination counsel for the
defendant objected, and based his objection on the grounds
that it was incompetent, irrelevant, immaterial, improper
cross-examination, and that the statements were privileged,
which privilege was claimed both by counsel and defendant,
and that the defendant declined to answer the questions on
the ground that it would tend to disgrace him. There was ev-
idence in the record which tended strongly to show that he had
committed the crime for which he was on trial for the pur-

pose of preventing exposure of the crimes about which he was questioned on cross-examination, which evidence he had specifically denied in his examination in chief, and the court in that case very properly held that the cross-examination was proper. In the course of the opinion it is said:

"There is ample authority for the proving of alias and collateral crimes for the purpose of showing the motive for the commission of the crime for which the defendant is being tried, the limitation being that such alias crime must bear such a relation to the crime for which the party is being tried that the court can clearly see that, if established, it will have a tendency to furnish motive for the commission of the other crime."

And again the court says:

"Plaintiff in error had denied what Swidenski had testified was his self-declared motive. The subject of motive being thus opened up, it was proper to cross-examine him upon the entire subject."

The court having determined, and very properly so, that the questions, under the circumstances of that case, were not privileged, the question as to whether the objection should be made by counsel or in person by the defendant became unimportant; and the opinion of the court, wherein it is held that the defendant in that case could not speak through his counsel and claim his privilege from answering questions that would tend to disgrace him, but that it was incumbent upon him to personally make the objection, at most, was only dictum. The court having held that the questions were not privileged, and that the defendant was properly compelled to answer them, the question as to whether a defendant in a criminal case who desires to claim his exemption from answering disgracing or incriminating questions is bound to claim his privilege personally or may do so through his counsel was no longer before the court. (McKelvey on Ev., 304.) The rule announced by the New York Court of Appeals is more in ac-

cord with the letter and spirit of our State Constitution (section 12, art. 1), which provides, among other things, that "in criminal prosecutions the accused shall have the right to appear and defend in person and by counsel, . . . (and) to testify in his own behalf," than the doctrine contended for by the state's attorney. To hold that, when a party accused of crime exercises his constitutional right and testifies in his own behalf, his right to appear by counsel is temporarily suspended, would, in effect, be holding that by the exercise of one of these constitutional rights the accused forfeits the other, and would lead to a construction which would be both unreasonable and absurd. (Underhill on Crim. Evi., sec. 66; *State v. Beal,* 68 Ind. 345, 34 Am. Rep. 263; *Clifton v. Granger,* 86 Iowa 573, 53 N. W. 316.)

The next question raised is, did the trial court err in permitting the district attorney, over defendant's objections, to ask him, on cross-examination, the questions hereinbefore mentioned respecting the commission by him of other crimes, none of which were in any way linked or connected with the one for which he stands convicted? The testimony thus sought to be elicited in no way tended to prove any issue, fact, or circumstance in the case. Nor did it directly or remotely refer to any fact or circumstance testified to by him, or that came within the range of his examination in chief. We recognize the well established rule that a defendant, when he takes the witness stand in his own behalf, may be cross-examined the same as any other witness. He may be examined as to any fact, occurrence, or transaction relevant to the issue, or which sheds light upon the commission and character of the offense for which he is on trial. And he may be questioned for the purpose of testing his memory, and examined as to matters which tend to discredit his testimony or which affect his credibility as a witness. But it is apparent that the questions complained of in this case were not asked, nor was the evidence sought to be elicited thereby, for any such purpose. And it is apparent that the questions were not asked, nor was the evidence sought to be elicited thereby, for the purpose of affecting his credibility as a witness or the weight of his testi-

mony, but were evidently intended to prejudice him before the jury. Besides, the State depended almost entirely upon the confession made by the defendant for conviction. For without this confession it is extremely doubtful if a conviction could have been procured. Now, the facts and circumstances leading up to and surrounding the commission of the crime, as testified to by the defendant are substantially the same as contained in his confession. The State, by impeaching his testimony, would necessarily, to the same extent, discredit his confession, which, as already observed, was practically the only evidence the State had upon which to base a conviction. These questions could not have been other than prejudicial to the defendant's case. He was on trial for his life, and the State had introduced in evidence his written and oral confessions, which tended strongly to prove him quilty of murder in the first degree. Section 4162, Revised Statutes, provides:

"Every person guilty of murder in the first degree shall suffer death, or, upon the recommendation of the jury, may be imprisoned at hard labor in the State Prison for life in the discretion of the court."

And the jury was so charged. And in *Calton v. People*, 130 U. S. 83, 9 Sup. Ct. 435, 32 L. Ed. 870, on appeal from the territorial Supreme Court of Utah, it was held reversible error not to so charge the jury. Whatever disposition, if any, there may have been on the part of the jurors to make the said recommendation, may have been entirely overcome and removed by reason of these rulings of the court. There is no settled and arbitrary rule defining the limits within which the cross-examination must be confined. The latitude that may be allowed is largely within the discretion of the trial court, to be exercised and governed by the facts and circumstances of each particular case. The demeanor and appearance of the witness while testifying, the extent and character of his testimony in chief, his inclinations and prejudices, the disposition he has shown to speak or evade the truth, as the case may be, the interest or lack of interest, if any, he has in the result

of the case in which he is called to testify, are matters that will in a measure determine the scope that ought to be allowed on cross-examination. And while, as we have suggested, it is a matter that is almost entirely within the discretion of the court to what extent the cross-examination of a witness may be carried, yet the weight of authority holds that, when a party on trial for a criminal offense testifies in his own behalf, it is an abuse of discretion and is error to permit the state, over his objection, to interrogate him respecting the commission of other crimes by him which are in no way connected with the one for which he is being tried, unless the questions asked relate to some crime or crimes for which he has been convicted, in which case the questions are proper and may be asked. And even in cases of this kind the questions will be permitted for the purpose only of affecting the credibility of the defendant. Now, the questions referred to did not in any degree tend to impeach or discredit any material statement or part of the defendant's testimony, which shows that he went to the car for the purpose of robbery, and with a loaded 44-caliber Colt's revolver, and commanded Gleason and Brighton to throw up their hands; that when he was told by Gleason to put up his hands (and he was thereby put under arrest), he started, with his drawn revolver still in his hands, to back out of the car; that he did not drop his gun, because he needed it; that when he fell, and Gleason and Brighton started towards him, he deliberately fired a shot, which, he says, may have killed Gleason, which shot was fired before he made any attempt to inform the men that "he was willing to give up;" that up to the time he fell nothing was said or done to cause him to abandon the thought of taking the money from those men; that while endeavoring to maim Gleason by shooting him in the arm the gun was prematurely discharged, and, instead of hitting Gleason in the arm as intended, may have inflicted the mortal wound of which he died; that after he had mortally wounded Gleason he deliberately and wantonly killed Brighton. The foregoing is a summary of the material facts in the case. Therefore it is idle to contend that the questions and answers referred to had a tendency, or even were intended, to

weaken or impeach the facts upon which the state relied for a conviction (and which are the only material facts in the case), or, for that matter, any fact or circumstance testified to by the defendant. His declarations to the effect that, at the time he started for the scene of his crime and when he arrived there, he had a mental reservation with respect to killing these men, is no proof whatever of a subsequent abandonment on his part. Neither does his evidence tend to show any such intention, wherein he says: "Q. I mean, when Gleason told you you had better put up your hands yourself, you have testified you immediately dropped your gun and backed up? A. I held the gun down in my hand. I didn't say a word, no, sir, right at that time. Q. You didn't say anything about you were going to give up until they got you cornered, did you? A. I did not. Q. Well why didn't you drop the gun out of your hand, if you were willing to give up? A. Well, I didn't think it was necessary to drop the gun. The men had made no movement. . . . I did just like any other human being would when I thought I was going to lose my life; I tried to tell them I was willing to give up. Q. Why didn't you drop your gun? . . . A. I am answering your question. If they had said anything I would have dropped the gun. Q. And you didn't voluntarily drop it, or give up the gun? A. I could not under such circumstances, and no other man under God's sun could. Q. You needed it? A. My life depended on it." If this testimony, which is the most favorable to him of any in the record, were entirely eliminated, the record would not show his guilt any more conclusively than it does in its present condition. In the case of the *People v. Brown,* supra, Chief Justice Church speaking for the court says:

"I am of the opinion that the cross-examination of the persons who are witnesses in their own behalf when on trial for criminal offenses should in general be limited to matters pertaining to the issues, or such as may be proved by other witnesses. I believe such a rule necessary to prevent a conviction

for one offense by proof that the accused may have
been guilty of others.   Such a result can only be
avoided practically by the observance of this rule."

This same doctrine was reaffirmed in a later case by the
New York court.   (*People v. Crapo,* 76 N. Y. 288, 32 Am.
Rep. 302.)   In that case the defendant was on trial for bur-
glary, and testified as a witness in his own behalf.   On cross-
examination he was asked the following question, which was
objected to:  "Were you also  .  .  .  arrested on a charge
of bigamy ?"   This was held to be reversible error.  The court,
in the course of the opinion, said:

"The discretion which courts possess to permit
questions of particular acts to be put to wit-
nesses for the purpose of impairing credibility
should be exercised with caution when an accused
person is a witness in his own trial.   He goes upon
the witness stand under a cloud; he stands charged
with a criminal offense not only, but is under the
strongest possible temptation to give evidence favor-
able to himself.   His evidence is therefore looked
upon with suspicion and distrust, and if, in addition
to this, he may be subjected to a cross-examination,
every incident of his life and every charge of vice
or crime which may have been made against him,
and which may have no bearing on the charge for
which he is being tried, he may be so prejudiced in
the minds of the jury as frequently to induce them
to convict upon evidence which otherwise would be
deemed insufficient.   It is not legitimate to bolster
up a weak case by probabilities based upon other
transactions.   An accused person is required to
meet the specific charge made against him, and is
not called upon to defend himself against every act
of his life."

Underhill in his work on Criminal Evidence (section 62),
says:

"To compel the accused to answer indiscriminately all questions, respecting past criminal transactions, which, though similar, are separate and distinct from that for which he is on trial, would not only be treating him more harshly than other witnesses, but would be a serious infringement of his constitutional privileges."

(*G. C. & S. F. Ry. Co. v. Johnson,* 83 Tex. 628, 19 S. W. 151; *State v. Houx,* 109 Mo. 654, 19 S. W. 35, 32 Am. St. Rep. 686; *Elliot v. Boyles,* 31 Pa. 67; *Commonwealth v. Schaffner,* 146 Mass. 515, 16 N. E. 280; *Emery et al. v. State,* 101 Wis. 648, 78 N. W. 145; *Anthony v. State* [Idaho] 55 Pac. 884; *People v. Un Dong,* 106 Cal. 83, 39 Pac. 12; *State v. Gleim* [Mont.], 41 Pac. 998, 31 L. R. A. 294, 52 Am. St. Rep. 655; *State v. Huff,* 11 Nev. 17; *State v. Underwood,* 44 La. Ann. 852; 11 South. 277; *Gale v. People,* 26 Mich. 157; *People v. Pinkerton,* 79 Mich. 110, 44 N. W. 180; *Elliot v. State,* 34 Neb. 48, 51 N. W. 315; *State v. Saunders,* 14 Or. 300, 12 Pac. 441; *Bailey v. State,* 67 Miss. 333, 7 South. 348; *State v. Carson,* 66 Me. 116; *Clarke v. State,* 78 Ala. 474, 56 Am. Rep. 45; *Commonwealth v. Thrasher,* 11 Gray 450.)

For the reasons herein stated, the case is reversed, with directions to the trial court to grant a new trial.

STRAUP, J., concurs.

BARTCH, C. J., concurring in the judgment of reversal, but not upon the grounds stated in the majority opinion.

I agree with my Brethren that this case ought to be reversed, but I do not agree with them as to the grounds upon which the reversal should be placed. Nor do I agree with them as to all propositions of law which they have announced, nor that they have "in substance quoted all the evidence bearing on" the question of abandonment. I will therefore, as this is an important case, state my views respecting the main questions presented.

As shown by the record, the only person who was present at

the time of the commission of the offense charged, and who
is now living, is the defendant, and from his testimony, and
confession which was admitted in evidence, it appears that on
the night of January 6, 1904, he went to the corner of Thir-
teenth East and Second South streets, Salt Lake City, for the
purpose of "holding up" a street car with intent to commit
robbery; that he went to the scene of the hold-up, placed a
handkerchief over his face as a mask, boarded the car, and,
with a 45-caliber revolver in hand, ordered the conductor and
motorman, there being no other person in the car, to hold up
their hands; that one of the men, who also had a gun, told him
he would better hold up his hands; that, realizing that the
men were not excited and were going to make a fight, the de-
fendant put his gun down by his side and started to back out
of the car, but, as he attempted to turn, near the door, he fell
down against the seat of the car; that as soon as he fell his
victims took hold of him, and Mr. Gleason tried several times
to shoot him, but his gun missed fire each time; that in the
scuffle which followed he shot and killed Mr Gleason, for
whose death he is now called upon to answer; that then, in
attempting to escape from the car, he shot and fatally
wounded Mr. Brighton, who was with Mr. Gleason; and that
on January 10, 1904, after he was arrested for the offense,
the defendant made a confession that he killed the two men
as a result of his attempt to perpetrate a robbery. In addition
to these facts and to the testimony quoted in the opinion of
the majority, there is other evidence in the record which has
bearing upon the questions presented and discussed in that
opinion, of which evidence, testimony of the defendant, as
follows, forms a part: "Gleason was a little east when he
used the pistol; we were in the extreme south end of the car.
Gleason came up and pointed the pistol at my left eye; I
looked right at the pistol; I saw his finger work; I heard the
clicking noise; I was positive he was going to fire; I closed
both eyes right tight, expecting it was the last minute—last
act of my life. At that time I was just about on one knee;
there was nothing to prevent me from shooting Mr. Gleason;
I could have killed him; I was sure he was going to kill me.

When they first took hold of me I made an effort to speak to them; I tried to tell them, when he started to put the gun down, not to kill me, I was willing to give up. I am not positive whether from what I said I made it clear: I stutter when I am badly excited; at times I cannot speak on that account; I have a very bad heart; it is hereditary in the family. During the time that Gleason and Brighton were coming the twenty feet to me I could have turned around and killed both of them; I made no effort to injure them in any way; I have always had a great horror of killing a man; I did not want to hurt them; I did not go there for the purpose of hurting them; I had no intention of killing either one of them, or of injuring them in any way. After Gleason had pointed the pistol at my eye and snapped it, I regained my feet; I was holding my gun off in my right away from him and to the south; Gleason stepped back and took his gun in both hands; he seemed to be working with it very rapidly; he pointed it toward my left side; as he pointed the pistol I had my gun up; the thought entered my mind 'If I could hit this man's arm, it would likely prevent him from firing,' so I started to pull down with the gun with the intention of trying to hit his arm; Mr. Brighton took hold of my arm and gave me a shove, and at the same time wrenched me toward Gleason; I was thrown hard against Gleason; it turned Mr. Gleason around; I cocked the pistol at the time I thought of shooting his arm; I did not have the pistol pointed toward Gleason when Brighton caught hold of me; Gleason was turned round toward the north at the same time Brighton put his hand around my head, so that I could not see, as he did so, the gun was discharged; I did not see Gleason at the time." Such is the character of the evidence appearing in the record.

The appellant, among other things, contends that the judge of the city court, who bound him over to the district court, had no jurisdiction as a committing magistrate, under the Constitution and laws of this State, and that therefore the subsequent proceedings in the district court and his conviction were unlawful and void. The city judge acted in this cause under

authority of section 14, chapter 109, page 113, Session Laws, 1901, which section provides:

"The city courts shall have exclusive original jurisdiction of cases arising under, or by reason of the violation of any city ordinances, and shall have the same powers and jurisdiction as justices of the peace in all other criminal actions, and the judges of said courts shall be magistrates, with all powers and jurisdiction of justices of the peace as magistrates."

It is conceded by the appellant that if the provisions of the act are constitutional the city judge had power to conduct the preliminary hearing in question, but it is insisted that this section is in contravention of the Constitution and void. The provisions of the organic law, cited and relied upon as affecting such result, are found in sections 1 and 21, article 8, Constitution. Section 1 reads:

"The judicial power of the state shall be vested in the Senate sitting as a court of impeachment, in a Supreme Court, in district courts, in justices of the peace, and such other courts inferior to the Supreme Court as may be established by law."

It is quite clear that under this section the Legislature had the right to establish city courts, like the one in question, which are inferior to the Supreme Court, and confer upon them judicial power which they must exercise in accordance with the provisions of law. Undoubtedly the conducting of preliminary hearings of persons charged with crime, by a court or magistrate, is the exercise of judicial power, which is not exclusive in the Supreme Court, and therefore, under this section of the fundamental law, the Legislature would have the right to confer upon inferior courts of the class in question that power, to be exercised concurrently with other courts. But the appellant contends that when this section is construed with section 21 of the Constitution, above referred to, the conferring of power to conduct such preliminary hear-

ings upon inferior courts, which the Legislature may create by virtue of section 1, is inhibited. Section 21 reads:

> "Judges of the Supreme Court, district courts and justices of the peace, shall be conservators of the peace, and may hold preliminary examinations in cases of felony."

Counsel for the appellant insists that the word "may," employed in this section, must be construed, to mean "shall;" that, when so construed, exclusive jurisdiction to hold preliminary examinations in cases of felony is vested in the courts mentioned in this section; and that the maxim, *"expressio unius est exclusio alterius,"* applies. This construction of section 21, thus contended for, would prohibit the Legislature from conferring a power which, as has been seen, it clearly may confer under the provisions of section 1, and would obviously render the two sections repugnant to each other. Such an interpretation would be a violation of the familiar rule of constitutional construction that, if possible, all parts of the instrument must be so construed as to render them harmonious with each other, and so as to give effect to each part.

> "Where provisions seem to conflict, a construction which will harmonize them, if practicable, will be adopted, and in construing them it must be presumed that the framers of the instrument used the words in their ordinary and natural sense. One provision of a Constitution will not be permitted to defeat another if by any reasonable interpretation both can be given effect." (*State ex rel. Lewis,* 26 Utah 120, 125, 72 Pac. 388; Cooley's Const. Lim. (7 Ed.), pp. 91-94; 8 Cyc. 730.)

I have no disposition to depart from these principles and adopt an interpretation which would produce conflict between the two sections. Nor do I think the maxim referred to has any application here. By giving the word "may" its plain and ordinary meaning, attributing to it the sense in which it

was employed by the framers of the Constitution, which is apparent from the context, the two sections are rendered entirely consistent and harmonious, and all the provisions will be given effect. The evident intention of section 21 was to confer power upon all the judges of the superior courts, as well as upon justices of the peace, to hold preliminary examinations in cases of felony, and not to prevent the enactment of a statute, like the one in question, which is valid under section 1. But even if this were otherwise, it could not avail the appellant in this case, because the city courts established by the statute in question are to all intents and purposes mere justices' courts. Although they are denominated "city courts," the judges thereof have substantially the same duties to perform as have justices of the peace. This court so decided in *Nichols v. O. S. L. R. Co.,* (Utah), 78 Pac. 866, where it was said:

"The city judges are magistrates, but, while sitting as magistrates, they exercise the powers and jurisdiction applicable to justices of the peace."

It was also, after having referred to the jurisdiction of city courts and of justices' courts, there said:

"It will thus be observed that city courts are quite similar to justices' courts, and that the office and duties of a city judge are substantially the same as the office and duties of a justice of the peace."

In line with the ruling thus made, a city judge may hold preliminary hearings the same as a justice of the peace, and I see no reason to question the correctness of the holding in that case. Aside from that decision, however, I am of the opinion that the section of the statute above considered is a valid exercise of legislative power under our Constitution, and that the city judge had jurisdiction to hold the preliminary examination.

At the trial, the defendant appeared as a witness in his own behalf, and, after he had testified concerning a portion of his life and the circumstances connected with the perpetration of

the crime charged against him, the prosecution, upon cross-examination, interrogated him as to other offenses, the proceedings concerning which are set out in the majority opinion. From those proceedings it will be noticed that the prisoner, as to all the questions thus propounded except one, claimed his constitutional privileges which exempted him from answering criminative or degrading questions, and was thereupon excused from answering by the court. It will also be noticed that the court ruled that the privilege was personal to the defendant—witness—and that his counsel could not claim it for him. The question which the witness was required to answer was whether he deserted the United States army. This was objected to by his counsel as irrelevant, immaterial, and not proper cross-examination, but the witness did not claim his privilege. My Brethren state that the question thus presented is, "Was it incumbent upon the defendant to personally make the objections and claim his privilege from answering the questions asked respecting the commission of other crimes by him, or did he have the right to make his objections and claim his privilege and immunity through his counsel?" Answering this question, they hold that the action of the court in the premises was prejudicial error, and that counsel could make the objections and claim the privilege for the witness. I can perceive no reversible error in any of these rulings. It is true the questions, with the one exception, had a tendency to show that the prisoner was guilty of other crimes of the same kind as the one he was attempting to perpetrate at the time of the homicide, but they were not for that reason incompetent. The questions were not asked for the purpose of establishing the prisoner's guilt of the crime charged, but for the purpose of showing the character and credibility of the person whose statements the jury were to consider and weigh. The jury had a right to know what kind of a man he had been and was, and what kind of a life he was leading, to determine whether he could be believed under oath or not, or to what extent his statements, favorable or unfavorable to his defense, ought to receive credit. The questions were therefore pertinent to the issue, and it was within the

discretion of the trial court to require him to answer or not, except when he claimed his privilege, and, as will be seen by reference to the majority opinion, he was in no instance required to answer when he did claim his privilege, although a court is not absolutely bound by every claim of privilege a witness may see fit to make. That the defense and jury understood that the questions were asked and the evidence received for the purpose of discrediting the witness, is clear from the defendant's objection quoted in the prevailing opinion, in which objection he stated that the question referred to "is incompetent, irrelevant, and immaterial. to affect the credibility of the witness." If the questions also were disparaging to his cause, otherwise than effecting his credibility, it was a consequence of his election to waive his constitutional right not to be compelled to give evidence. against himself by becoming a witness in his own behalf. That right was personal to the prisoner, a personal right which he could waive, as decided by this court in *State v. Mortensen,* 26 Utah 312, 73 Pac. 562, 633. If Such highway robbers and murderers who ply their trade under cover of darkness and secrecy, with no one present but the unfortunate victim, where the result is, as in this instance, with no one left to tell the story to the court and jury, except the perpetrator of the crime, are to be thus shielded, by withdrawing from the prosecution the right to cross-examine, by judicial decision, except as to matters concerning which the accused was examined in chief, and as to matters connected immediately with the particular offense charged, then this court must usurp the functions of the Legislature, and by so doing will render this state a fertile field for the perpetration of crime. If there was legislation in this judisdiction so limiting the right of cross-examination, and to the effect that an accused, upon becoming a witness, did not assume the character of an ordinary witness, but still, while a witness, retained merely his character as defendant, then there might be some ground upon which to base such a decision, but we have no such legislation, and therefore the case from New York, quoted from extensively by my Brethren, ought not to be regarded as controlling. authority against the

unanimous decisions of this court in the cases of *People v. Hite*, 8 Utah 461, 33 Pac. 254, and *People v. Larsen*, 10 Utah 13, 37 Pac. 258, which are in effect overruled by this decision, in face of the statute to the contrary, as will later herein be seen. I observe nothing in the record to warrant the statement, made in the prevailing opinion, that "it is apparent that the questions were not asked, nor was the evidence sought to be elicited thereby, for the purpose of affecting his credibility as a witness or the weight of his testimony, but were evidently intended to prejudice him before the jury." If this is apparent from the record, then the judge before whom the case was tried must have known it, but the record suggests to my mind no such unfairness to the prisoner by the judge, nor by the prosecuting officer, as is thus imputed. In my judgment, the circumstances connected with this atrocious crime were such as justified the court in permitting this cross-examination, and, when the accused entered upon the perpetration of such a heinous offense, he did it in the face of the law as it had been declared by this court on several occasions. Of course, it is conceded by all that it is the solemn duty of the court, in the exercise of its large discretion respecting the limits of cross-examination, carefully to protect the rights of the accused, no matter how diabolical the crime charged against him may be; but it is equally its duty to guard the safety of the lives and property of the citizens from the viciousness of criminals by a just and proper enforcement of the laws intended for the protection of society—the individuals composing the community. I see no abuse of discretion by the court in this case. That court, with the defendant and witness in its immediate presence, had a better opportunity to judge of the motives which actuated the prosecution in the cross-examination of the witness, and of the justness and importance of permitting a more or less wide latitude in such examination for the purpose of arriving at the truth of the story of the defendant, than have we with the printed record before us. In such a case, unless the record very clearly shows an abuse of discretion, this court ought not assume that the trial court acted in this behalf in a manner not warranted

by law. I can observe in the rulings upon the questions under consideration no departure from the law of this jurisdiction that amounted to reversible error.

The prisoner, waiving his constitutional privilege, and taking advantage of the law which permitted him to testify in his own behalf, left for the time being his position as defendant, and assumed that of a witness in the case. Having done this, he became subject, for the time of his examination, to the same rules, and was bound to submit to the same tests, which by law apply to other witnesses. This is so under our statute, which in section 5015, Revised Statutes 1898, provides:

"If a defendant offers himself as a witness he may be cross-examined by the counsel for the state the same as any other witness. His neglect or refusal to be a witness shall not in any manner prejudice him, nor be used against him on the trial or proceeding."

Here is a plain provision of statute authorizing in express terms, the counsel for the State to cross-examine such a defendant "the same as any other witness," if he offers himself as a witness, yet, in the face of this statute, my Brethren draw a distinction, existing neither in sound reason nor in law within this jurisdiction, between a defendant who is a witness and a witness who is not a defendant. As to the latter, they admit that "the right to refuse to answer incriminating questions is a personal privilege of the witness which he can either exercise or waive," while, as to the former, they say: "We do not understand the authorities to hold that when the witness is also the defendant in the case his counsel cannot speak for him and make the proper objections and protect him in his right and immunity from answering questions on cross-examination respecting the commission by him of other crimes which are in no way connected with the one for which he is on trial." With due respect for the understanding of my learned Brethren thus expressed, I am impelled to say that my examination of the authorities upon this subject has led me to an understanding exactly the opposite—that the author-

ities, under statutes like or similar to ours, are practically unanimous in holding that when a defendant offers himself as a witness in his case he is subject to cross-examination the same as any other witness, and that his counsel cannot claim his privilege for him. A very strong reason for this rule is that counsel, in the nature of things, at least in many instances, in not familiar with the facts which induce the question and is not under oath, while the witness, with a knowledge of the facts in his own breast, is sworn and must answer under his oath; and, when such a witness so answers a question upon cross-examination as to a collateral matter, the state is bound by his answer and cannot impeach him.

As to the proposition that a defendant who offers himself as a witness is subject to cross-examination the same as any other witness, Mr. Underhill, in his work on Criminal Evidence (section 60), says:

> "In states where the cross-examination of the accaused is not by statute expressly limited to matters brought out on his direct examination, he may be cross-examined, not only upon matters strictly revelant to the issue, but upon those which are collateral and apparently irrelevant, and which are calculated only to test the credibility and weight of his testimony."

This is supported by numerous authorities cited. And in section 61, Id., the author says:

> "He may be questioned as to specific facts calculated to discredit him. Thus his previous arrest or indictment, his conviction of a felony, a previous imprisonment in a penitentiary or house of correction, his prior contradictory statements, disorderly actions, or the commission of offenses similar to that charged, attempts to bribe witnesses, or simulation of insanity, may all be brought out by questions put to him on his cross-examination, to show what credit his evidence should receive."

So, in 1 Greenl. Ev., section 444b, the author, speaking of the accused as a witness, says:

> "Is his position as a witness so separable from his position as a defendant that what would be usable to impeach him as a witness, but would not be available against him merely as a defendant, may still be used? In particular, may his bad character be shown, may this character be searched into on cross-examination, may the other tests applicable to witnesses be employed? The answer, as policy clearly demands, is in the affirmative; for otherwise, if he were a false witness, the customary methods of exposing this would not be available, and the investigation of truth and the punishment of crime would be defeated. These reasons have led to the general acceptance of the rule that an accused person taking the stand as a witness may be impeached precisely like any other witness, i. e., by reputation as evidence of character, by cross-examination to character, by conviction of crime and the like."

In *People v. Hite,* 8 Utah 461, 33 Pac. 254, where the cross-examination took a wide range, Mr. Chief Justice Zane, speaking for the court, said:

> "In his cross-examination the prosecuting attorney went still further back, and his inquiry descends still further into particulars. He interrogated the defendant as to transactions evidently for the purpose of testing his recollection and bringing to light conduct that would affect his credibility. It is the duty of the juror to judge of the credibility of the witness, and to weigh his testimony in the light of his opportunities to know, to understand, and remember, and in view of his motives and his moral worth as evidenced by his conduct, and in view of his character established by his life, as well as by the light of experience and reason. To enable the juror to judge of the cred-

ibility of the witness, rigid cross-examinations are sometimes necessary, and much latitude of inquiry should be permitted. The investigation of truth is sometimes attended with humiliation and disgrace of the witness and appears to be remorseless."

So in *People v. Casey,* 72 N. Y. 393, Mr. Justice Earl said:

"Upon the trial the prisoner was a witness in his own behalf, and it is now complained that the counsel for the people, upon cross-examination, was permitted to question him as to other altercations in which he had been engaged, and other assaults which he had committed. The complaint is not well founded. When a prisoner offers himself as a witness in his own behalf, he is subject to the same rules upon cross-examination as any other witness. He may be asked questions disclosing his past life and conduct, and thus impairing his credibility. Such questions may tend to show that he has before been guilty of the same crime as that which he is upon trial, but they are not on that account incompetent. When he offers himself as a witness, and seeks to take the benefit of the statute which authorizes him to testify in his own behalf, he takes the hazard of such questions. He must determine, before he offers himself, whether his examination will benefit or injure him. The extent to which such an examination may go to test the witness' credibility is largely in the discretion of the trial court."

In *Hanoff v. The State,* 37 Ohio St. 178, 41 Am. Rep. 496, it was said:

"If error would not lie to a like cross-examination of any other witness as to his previous conduct, for the purpose of affecting his credibility, we see no reason why it should when a party himself is the witness. The object and importance of a cross-ex-

29 Utah—5

amination of a defendant is the same, and therefore the rules governing it should be the same. In matters collateral and irrelevant to the particular charge, it is difficult to define with precision the limits of such cross-examination when the object is to test the credibility of a witness. In this court the question may be regarded as settled that the limits to which a witness may be cross-examined on matters not revelvant to the issue, for the purpose of judging of his character and credit from his own voluntary admissions, rest in the sound discretion of the court trying the cause. Such questions may be allowed where there is reason to believe it will tend to the ends of justice, but they ought to be excluded when a disparaging course of examination seems unjust to the witness and uncalled for by the circumstances of the case."

Likewise, in *People v. Conroy,* 153 N. Y. 174, 47 N. E. 258, it was said:

"Defendant's counsel complain that defendant on cross-examination was asked as to specific immoral acts, and that, although he refused to answer, he was greatly prejudiced. When a defendant takes the witness stand he subjects himself to a searching cross-examination. The district attorney is permitted a very wide range as to the topics of inquiry, and it is a peril a defendant assumes when consenting to become a witness in his own behalf."

In *Wilber v. Flood,* 16 Mich. 40, 93 Am. Dec. 203, it was held:

"The cross-examination of a witness is not confined to matters in issue, but may include such collateral questions as will enable the jury to obtain an insight into his character and history, and thus to judge of his credibility; and the court has power to guard against the abuse of this right, when neccessary."

So, in *Commonwealth v. Nichols,* 114 Mass. 285, 19 Am. Rep. 346, Mr. Chief Justice Gray said:

> "A party to the cause, who vountarily offers himself as a witness, is entitled to no more, and in some respects to less, protection than a third person who testifies in obedience to a summons. A party taking the stand as a witness in his own behalf may be cross-examined in relation to a communication between himself and his counsel, as to which the latter would not be allowed to testify. (*Woburn v. Henshaw,* 101 Mass. 193, 3 Am. Rep. 333.) And a refusal to answer a question, on the ground that it might incriminate him, is competent evidence against him, when it would not be against an ordinary witness."

In *Territory v. O'Hare,* 1 N. D. 30, 44 N. W. 1003, it was said:

> "We hold that the right of cross-examination as to outside matters of fact which affect the general character of the witness, and tend to degrade him, and affect his credibility, is, within the limits of a sound judicial discretion, a salutary rule."

In *State v. Witham,* 72 Me. 531, it was said:

> "When the accused volunteers to testify in his own behalf at all upon the issue whether the alleged crime has been committed or not, he volunteers to testify in full. His oath in such case requires it. If he waives the constitutional privilege at all, he waives it all. He cannot retire under shelter when danger comes. The door opened by him is shut against retreat. The object of all examinations is to elicit the whole truth, and not a part of it. Under our rule, the cross-examination of a witness is not confined to the matters inquired of in chief. A party testifying as his own witness can be examined just as any other witness could be in any re-

spect material and relevant to the issue. To some
extent, more may be elicited from him than from a
common witness, because his statements are admissions
as well as testimony. Any other construction
would render the statute a shield to crime and criminals."

(1 Greenl. Ev., sec. 444b, 449; Underhill, Crim. Ev., sec.
60-62;Whart. Crim. Ev., secs. 430, 432, 433; *Common-
wealth v. Smith*, 163 Mass. 411, 40 N. E. 189; *Wroe v. The
State*, 20 Ohio St. 460; *People v. Clark*, 102 N. Y. 735, 8
N. E. 38; *People v. Robinson*, 86 Mich. 415, 49 N. W. 260;
*Yankee v. The State*, 51 Wis. 464, 8 N. W. 276;*People v.
Foote*, 93 Mich. 38, 52 N. W. 1036; *Stalcup v. State*, 146
Ind. 270, 45 N. E. 334; *The State v. Pfefferle*, 36 Kan. 90,
12 Pac. 406; *State v. Merriman* [S. C.], 13 S. E. 328; *Peo-
ple v. Mather*, 4 Wend. 229, 21 Am. Dec. 122; *Frank v.
State*, [Wis.], 68 N .W. 657; *State v. Ober*, 52 N. H. 459,
13 Am. Rep. 88;*Mc Keone v. People*, 6 Colo. 346; *Connors
v. People*, 50 N. Y. 240; *Commonwealth v. Tolliver*, 119
Mass. 312; *Mitchell v. The State*, 94 Ala. 68, 10 South. 518.)

Many other authorities, to the same effect as the forego-
ing, might be cited here, but it is not deemed necessary.

It seems almost too clear for argument that under our stat-
ute, and the decisions of the courts made under similar stat-
utes, and upon the authority of the text-writers, when the de-
fendant assumed the character of a witness in his own behalf
he became subject to cross-examination the same as any ordi-
nary witness, and that the mere fact that he was also defend-
ant conferred upon him no privilege, respecting his answers
to criminating or degrading questions, not enjoyed by or ap-
plicable to any other witness, there being no statute restrict-
ing the right of cross-examination to matters inquired of in
the examination in chief. He was not compelled to submit
himself as a witness, nor to answer incriminating or degrad-
ing questions. Nor did the court coerce him when he claim-
ed his privilege. The answering of such questions in a crim-
inal case is purely a personal privilege of the witness, as here-
inbefore stated, and as the authorities, to which reference will

be made herein, show; and, in accordance with sound reason under an overwhelming weight of authority, counsel can neither claim the privilege nor waive it for him.

Such a defendant is bound to determine for himself, before he assumes the character of a witness, whether his examination will benefit or injure him. His refusal to become a witness cannot, under the statute, be used to his prejudice. And this is what this court, in line with the great weight of authority, decided in *People v. Larsen,* 10 Utah 143, 37 Pac. 258, where is was said:

"This immunity from answering degrading or criminative interrogatories or cross-interrogatories is purely a personal privilege of the witness, which he can claim or waive at his pleasure. His counsel can neither claim nor waive it for him. It is a privilege of crime, and he alone can know whether an answer will subject him to punishment. The witness may waive it, and answer, regardless of any objection of counsel. If he declines to answer, that circumstance cannot be permitted to draw an inference of the truth of the fact to which the question relates. When he chooses to become a witness in the case, he leaves his position as defendant, and while he is upon the stand he is subject to the same rules, and must submit to the same tests, which by law are applicable to other witnesses."

But my Brethren say: "We have been able to find but three cases which go to the extent of holding that, when a defendant takes the witness stand in his own behalf, he, for the time being, in effect, ceases to be a defendant, and forfeits his constitutional right to the assistance of counsel." They then refer to *People v. Larsen,* supra, *State v. Wentworth,* 65 Me. 234, 20 Am. Rep. 688, and *State v. Kent,* 5 N. D. 516, 67 N. W. 1052, 35 L. R. A. 518, as the three cases. These cases hold, same as many others, as will be seen, that the privilege of exemption from answering degrading or criminative questions upon cross-examination is a privi-

lege of the witness alone, and that counsel cannot claim or waive it for him; but neither of them, nor any other case to which my attention has ever been invited, has held that a defendant who offers himself as a witness in his own behalf thereby "forfeits his constitutional right to the assistance of counsel." If my Brethren intended to limit this comprehensive expression to the time of the examination of the witness, then I answer that, under our Constitution and laws as they have hitherto existed and been construed, such a witness has no constitutional or other right to have counsel make the objection and claim the privilege for him, and that therefore he can forfeit no such right. They also say that the Appellate Court of New York passed upon this identical question in *People v. Brown,* 72 N. Y. 571, 28 Am. Rep. 183, and it may be conceded that the language which they quote from the case sustains their views, but that case was evidently decided under different provisions of law from ours, and they have cited no other case which sustains their position upon this question.

Referring to the practice in New York as it once existed, the author, in I Greenl. Ev., sec. 444b, says:

"It was at one time supposed in New York that the scope of cross-examination to misconduct was narrower for a defendant witness than for others; but this limitation seems no longer to be law in that jurisdiction nor elsewhere."

This statement of the learned author is entirely justified by the decisions from that State anterior and subsequent to the case of *People v. Brown,* relied upon by my associates in this case. In fact, no decision has come to my attention, from that state or any other, which, as to this precise question, has followed *People v. Brown,* except the one herein. Notwithstanding the high regard which is due the decisions of the eminent jurist who delivered that opinion, the doctrine announced therein does not appear to be supported by the decisions of his own State, nor elsewhere. The doctrine is based upon the assumption that there is a distinction between an ordinary

witness and a defendant witness, as will be noticed from the opinion, where it is said: "I understand it to be conceded by the counsel for the people that this objection would be valid if it had been taken by the witness himself instead of the counsel, and the case shows that the county judge entertained the same view. Such is the rule as to a witness who is not himself a party. It is, then, a question between the witness and the court, with which the party has nothing to do, and with which the counsel of the party has no right to interfere. (*Cloyes v. Thayer*, 3 Hill, 564; *Southard v. Rexford*, 6 Cow. 254.)" In the former case cited it was held: "The witness' privilege is personal;" and in the latter: "His privilege is personal only." The later New York cases show that no such distinction exists under laws similar to our own.

In *People v. Tice*, 131 N. Y. 651, 30 N. E. 494, 15 L. R. A. 669, it was said:

"The differences in the decisions in different states are attributable in part to a difference in the language of the statutes. Some of the statutes in terms limit the cross-examination to matters referred to in the examination in chief. In neither of the two classes of decisions is there, we apprehend, any invasion of the constitutional provision referred to. The accused is not compelled to become a witness. When he avails himself of the privilege conferred by statute, he subjects himself voluntarily to the situation of any other witness, and if he is compelled to answer disparaging questions, or to give evidence relevant to the issue which is injurious, it is the consequence of an election which he makes to become a witness, which involves a waiver on his part at that time of the constitutional exemption. If he accepts the privilege given by the statute, he takes it with its attendant dangers. 'His own act is the primary cause, and, if that is voluntary, he has no reason to complain.' (Church, Ch. J., in *Connors v. People*, 50 N. Y. 240.) The principle that an accused person who becomes a witness in his own be-

half thereby places himself in the attitude of any other witness in respect to the right of cross-examination has been announced in many cases in this court. (*Brandon v. People*, 42 N. Y. 265; *Con nors v. People*, supra; *Stover v. People*, 56 N. Y. 315; *People v. Casey*, 72 N. Y. 394.) The same rule has been declared in the courts of Massachusetts, Maine, New Hampshire, and other states, under statutes similar to the statute of this State. (*Com. v. Mullen*, 97 Mass. 545; *State v. Witham*, 72 Me. 531; *State v. Ober*, 52 N. H. 459, 13 Am. Rep. 88.)"

In this same case, page 657 of 131 N. Y., page 496 of 30 N. E. (15 L. R. A. 669), it was also said:

"The statute permits the accused to be a witness. This must mean a witness generally in the cause, and not that he may be a witness as to such matters only as to which he may choose to testify. This being the construction put by our courts upon the statute, there is no constitutional right infringed if the accused, having elected to take the stand as a witness, is subjected to the ordinary rules of examination. 'The range and extent of the cross-examination is within the discretion of the trial judge, provided only that it relates to relevant matters, or to matters affecting credibility. The trial judge may properly restrict the cross-examination of accused persons within narrower limits than in ordinary cases, but the latitude allowed is a matter for the trial judge.'"

So, in *People v. Webster*, 139 N. Y. 73, 34 N. E. 730, it was said:

"It is now an elementary rule that a witness may be specially interrogated upon cross-examination in regard to any vicious or criminal act of his life, and may be compelled to answer unless he claims his

privilege. A party who offers himself as a witness in a criminal cause is not exempt from the operation of the rule. He is not compelled to testify, and, if not examined, the law provides that it shall not give rise to any presumption against him. When he elects to become a witness, it is for all the purposes for which a witness may be lawfully examined in the case, and he is not, in the constitutional sense, 'compelled to be a witness against himself,' although, when subjected to the test of a legitimate cross-examination, he may be required to make disclosures which tend to discredit or to incriminate him." (*People v. Conroy,* 153 N. Y. 174, 187, 47 N. E. 258.)

Other New York cases are to the same effect. Text-writers and decisions from other states, under similar constitutional and statutory provisions, also show that such a privilege is personal, whether the witness is the defendant or not.

In Greenl. Ev., section 469d, the author says:

"The making of the claim, and its determination, being intended solely for the witness' sake, the privilege is his own, and not that of the party; counsel, therefore, will not be allowed to make the objection, nor, if the court erroneously disregards the privilege, may the party complain of the error."

In Whart. Crim. Ev., sec. 465, it is said:

"The privilege just stated cannot be interposed by a party to the issue. It must be claimed by the witness in order to be available."

In Roscoe's Crim. Ev., p. 233, after a review of authorities, it was said:

"It will thus be seen that in all cases where the point has directly arisen, it has been held that the bare oath of the witness that he is endangered by being compelled to answer is not to be considered as necessarily sufficient, but that the judge is to use

his discretion whether he will grant the privilege or not. Of course, the witness must always pledge his oath that he will incur risk; and there are innumerable cases in which a judge would be properly satisfied, without further inquiry, but, if he is not satisfied, he is not precluded from further investigation."

In *State v. Kent*, 5 N. D. 516, 541, 556, 67 N. W. 1052, 1058, 1063, 35 L. R. A. 518, a well-considered case, in which the New York case is commented upon, it was said:

"It is also well established that, when a defendant in a criminal case voluntarily takes the witness stand in his own behalf, he thereby subjects himself to the same rules of cross-examination that govern other witnesses, with the exception that his privileges are to some extent curtailed, in that he is not only required to answer any relevant and proper question that may tend to convict him of any collateral offense, when such answer also tends to convict him of the offense for which he is being tried, or bears upon the issues involved in such case. . . . The claim of privilege, when made by counsel alone, even when, as in this case, counsel says, 'the privilege is claimed by both counsel and the defendant,' is not, and cannot be, supported by the oath of the witness. This, as we have seen, is demanded both by authority and reason, and we can conceive of no sufficient ground to support an exception in favor of a party. (*State v. Wentworth,* 65 Me. 234, 20 Am. Rep. 688.) No doubt, counsel have the right, in protecting their clients, to raise the point, and call the attention of the court to the matter, and demand that the witness be apprised of his rights, and given an opportunity to make the claim under oath, if he so elect. We think this would be the proper method of raising the point in these cases. Of course, the witness might do it without the intervention of

counsel. A refusal of the trial court to properly instruct a witness when thus requested by his counsel might constitute reversible error. We hold, then, that the claim of privilege, by reason of the criminating nature of the answer sought, was not made with sufficient definiteness to apprise the court of the nature of the claim; and, further, that the claim cannot be made by counsel, even when the witness is also a party."

In *Samuel v. The People*, 164 Ill. 379, 45 N. E. 728, it was said:

"The privilege is that of the witness, and not of the party, and counsel will not be allowed to make the objection. The privilege cannot be interposed by either party to the action, nor can either party raise the objection on behalf of the witness. It must be claimed by the witness in order to be available, and it lies with him to claim it or not, as he may choose. As the privilege is personal to the witness, he may waive it and elect to testify."

In *State v. Wentworth*, 65 Me. 234, 20 Am. Rep. 688, Mr. Chief Justice Appleton said:

"The defendant, going upon the stand as a 'competent witness,' was inquired about as to certain sales made by him prior to the one charged in the complaint, to which he made answers admitting prior sales by himself. The witness interposed no objection to answering the question because the answer might be self-criminative, but the objection was taken by the counsel for the defendant and by him alone. Now, if there is anything well settled, it is that the privilege of exemption from answering interrogatories, which, being answered truly, would disclose the guilt of the person interrogated, is the privilege of the witness alone. It is granted because of crime and for its impunity, lest, by means of and

in consequence of the proof furnished by the an-
swer, the witness may hereafter be subjected to the
punishment which the law has fixed to his criminal
misconduct. It is the privilege of crime. The in-
terests of justice would be little promoted by its en-
largement. 'The privilege,' observes Nelson, C. J.,
in *Cloyes v. Thayer,* 3 Hill 564, 'belongs exclusively
to the witness, who may take the advantage of it,
or not, at his pleasure. . . . The witness may
waive it and testify, in spite of any objection com-
ing from the party or his counsel.' In *Ward v.
The People,* 6 Hill 144, the court held that the
public prosecutor has no right, in the trial of an
indictment, to object that a question put to one of
the witnesses called for an answer tending to expose
him to criminal punishment; this being an objection
which the witness alone is authorized to make. So,
in *State v. Foster,* 3 Fost. 348, 55 Am. Dec. 191,
it was to lay with the witness to claim the privilege
or not, as he may choose. It is obvious that if the
defendant is to be regarded, when testifying, only
as a 'competent witness,' which is what the statute
makes him, 'at his own request and not otherwise,'
that the exemption from answering criminative
cross-interrogation is personal, and the witness alone
can claim it."

So, in *Brandon v. The People,* 42 N. Y. 265, where the
question, "Have you ever been arrested for theft?" was put
to the defendant witness on cross-examination and objected to
by the defendant's counsel, but the privilege not claimed by
the witness, it was said:

"The question complained of was put to the wit-
ness for the purpose of impairing her credibility as
a witness. It has been the practice of the courts of
this State from a very early period to permit ques-
tions of this character to be put to the witness, and
for the purpose indicated. Its abuse is guarded

against in two modes: (1) By the privilege of the witness to decline to answer any question which may disgrace him, or may tend to charge him as a criminal. (2) By the power of the court, of its own motion, to prohibit an unreasonable or oppressive cross-examination. . . . She was not compelled to take this position, the statute declaring that the failure to testify should not create a presumption against her. She elected, however, to make herself a witness. She became and was a competent witness. For this purpose, she left her position as a defendant, and while upon the stand was subject to the same rules, and called upon to submit to the same tests, which could by law be applied to other witnesses. Her statements were made to the jury under the solemnity of an oath. In theory of law, this gave greater weight to her narration than if she had placed her simple declaration before the jury, unaccompanied by her oath. She cannot claim the advantages of the position of a witness and at the same time avoid its duties and responsibilities. If one so testifying should testify to a willful falsehood on a material point, I cannot doubt that the offense would be perjury. The character of party in the same cause would afford no defense to such an accusation."

Likewise, in *Morgan v. Halberstadt*, 60 Fed. 592, 9 C. C. A. 147, it was said:

"It is a sufficient answer to the contention of plaintiff in error to refer to the well-settled principle that such privilege belongs exclusively to the witness. The party to the suit has no right to insist upon it, except when he is himself a witness. And if the witness waives his privilege, or the court disregards it and requires him to answer, the party has no right to interfere or complain of the error."

In the Burr trial (1 Burr's Trial, 244), on the question

whether the witness was privileged not to accuse himself, Mr. Chief Justice Marshall said:

> "If the question be of such a description that an answer to it may or may not criminate the witness, according to the purport of that answer, it must rest with himself, who alone can tell what it would be, to answer the question or not. If, in such a case, he says upon his oath that the answer would criminate himself, the court can demand no other testimony of the fact."

(1 Roscoe's Crim. Ev., 323 et seq.; 3 Rice on Ev., pp. 296-314; Whart. Crim. Ev., sec. 473; 1 Greenl. Ev., sec. 469d; *People v. Larsen,* 10 Utah 143, 37 Pac. 258; *Commonwealth v. Shaw,* 4 Cush. 594, 50 Am. Dec. 813; *Ingersol v. McWillie,* 87 Tex, 647, 30 S. W. 869; *State v. Butler,* 47 S. C. 25, 24 S. E. 991; *Roddy v. Finnegan,* 43 Md. 490; *Clark v. Reese,* 35 Cal. 89; *Floyd v. The State,* 7 Tex. 215; *Kirshner v. The State,* 9 Wis. 140; *Thomas v. The State,* 103 Ind. 419, 2 N. E. 808; *Treat v. Browning,* 4 Conn. 408, 10 Am. Dec. 156; *White v. The State,* 52 Miss, 216; *Lothrop v. Roberts,* 16 Colo. 250, 27 Pac. 698; *State v. Cohn,* 9 Nev. 179; *State v. Foster,* 3 Fost. 348, 55 Am. Dec. 191.)

The same doctrine exists in England.

In 2 Taylor, Ev., section 1465, it is said:

> "In all the cases hitherto put, where the witness is not compellable to answer or to produce documents, the privilege is his, and not that of the party; and, consequently, counsel in the cause will not be permitted to make the objection. Neither will the witness be allowed to employ counsel of his own to support his claim to protection. Nor even is the judge bound, as it would seem, to warn the witness of his right to demur to the question, though, in the exercise of his discretion, he may occasionally deem it proper to do so."

So, in 1 Roscoe's Crim. Ev., 233, upon a review of English cases, it was said:

> "It will thus be seen that, in all cases where the point has directly arisen, it has been held that the bare oath of the witness that he is endangered by being compelled to answer is not to be considered as necessarily sufficient, but that the judge is to use his discretion whether he will grant the privilege or not. Of course, the witness must always pledge his oath that he will incur risk, and there are innumerable cases in which a judge would be properly satisfied with this without further inquiry; but if he is not satisfied he is not precluded from further investigation."

In *Paxton v. Douglas*, 16 Ves. 239, the Lord Chancellor said:

> "My opinion at present is that the objection is not to putting the question, but to answering it when put; that the witness is before the master precisely in the situation of a witness called to give his evidence personally, and the objection is not to the question, but to answering it. I therefore think, at present, that the interrogatories must be put to the witness, and it must be left to himself whether he will answer them or not."

So, in *East v. Chapman*, 1 M. & M. 46, it was said:

> "The counsel in a cause have no right to object, in favor of a witness, that the answer to a particular question renders him liable to punishment or forfeiture. Such objection belongs to the witness only."

(2 Taylor, Ev., secs. 1465-1467; 1 Roscoe's Crim. Ev., 232-234; *Thomas v. Newton*, 1 M. & M. 244; *Fisher v. Reynolds*, 12 C. B. 761; *Adams v. Lloyd*, 3 Hurlst. & Nor. 351; *Parkhurst v. Lowton*, 2 Swanst. 194.)

As to the question about having deserted the army, the record fails to show that the witness claimed his privilege, and

the objection, in the form made, is, under the circumstances, not sound. After the defendant had shown, by his examination in chief, that he hailed from Missouri; that his people lived there; that he was in Idaho previous to his coming to Salt Lake City; that he was employed in Idaho, and purchased the pistol, with which he slew his victims there; and, after having further testified in detail concerning his criminal and felonious assault which resulted in the fatal conflict, he being the only eyewitness left alive—the prosecution had a right to cross-examine him, as to his past life and career, for the purpose of throwing light upon his credibility as a witness. He could not, according to the former decisions of this court, sustained, as has been seen, by a great weight of authority, upon his own volition offer himself as a witness and testify to such portions of his life and conduct as might answer his purpose, and then complain of and wholly defeat a cross-examination as to parts which might not suit his purpose, although he could claim immunity from answering degrading or criminative questions as purely a personal privilege. Considering the examination in chief and the circumstances of this case, I perceive no abuse of discretion in overruling the objection to this question. This case was tried upon the theory of self-defense. The defendant, while admitting that he attempted to rob his victims, and that the killing of the deceased resulted from such attempt, claims that, before the fatal shots were fired, he had in good faith abandoned his felonious design, with an attempt to withdraw from the struggle, and that the deceased continued the affray with such fierceness that it became necessary to fire the fatal shots in order to save his own life. When the case was submitted to the jury, the defense presented several written requests to the court to charge upon that theory, all of which were refused, without giving any instruction upon the particular point raised, and the refusal has been assigned as error.

The appellant insists that abandonment of the felonious design was the controlling question in the case, and constituted one of fact for the jury. The respondent contends that it appears from the defendant's own testimony that all his actions

constituted one continuous transaction, and that, after making his criminal assault, there was no such abandonment of the conflict by him as justified him to kill in self-defense. Relating to the question here presented, the defendant, in part, testified, substantially, that he entered the car in which the homicide was committed, and told his victims to hold up their hands; that the larger one obeyed, while the smaller one refused to do so, and said, "You had better put up yours," he having a gun; that then the defendant, realizing that, if he continued, there would be a chance of hurting them, started to back out of the car, and put his gun down by his side, thinking they would know by that movement that he intended to leave; that, when he was within a couple of feet from the door, his feet, as he attempted to run, slipped, and he fell against the side of the seat; that as soon as he was in that position, and with the pistol in his right hand on the floor, the men made a rush for him, when he fired a shot, thinking that by doing so they would stop and not kill him; that they, however, fell upon him, and that Mr. Gleason, with a loaded pistol, tried to shoot him, but for some reason the gun did not go off; that Mr. Gleason snapped at him two or three times; that to prevent Mr. Gleason from killing him he took aim at his arm to shoot and break it, when the other man grabbed the defendant's arm, and, pulling it around, the gun went off and the shot hit Mr. Gleason; that he had no intention to kill him, and did not know he had done so at the time; that then he wrenched himself loose from Mr. Brighton and tried to get out, but Mr. Brighton got between him and the door, and reached under his coat, the defendant thought, for a gun; that as Mr. Brighton reached under his coat defendant said to him, "For God's sake, man! don't kill me; I will give up," but that he continued to keep his hand under his coat, and then he shot him to make his escape; that, when they first took hold of him, defendant tried to tell Mr. Gleason, who had the gun, not to kill him, that he was willing to give up to him, Gleason, but whether he made it clear or not he did not know, on account of stuttering considerably because of the excite-

29 Utah—6

ment; that at times, when excited, he has that defect of speech; that if he had not thought that the men intended to kill him he never would have fired at Mr. Gleason's arm; that he was willing at every moment of time, after he started to back out of the car, to give up and let them take him in preference to hurting them; and that neither of the men asked him to surrender or give up. With this and other evidence of similar import in the record, the defense, in writing, requested the court to charge the jury upon the question of abandonment by the defendant of the felonious designs, and of an attempt by him to withdraw from the combat. All the requests of this character were refused. One of them reads as follows: "If you find from the evidence that Mr. Gleason was shot by the defendant after the attempt to rob had been volun tarily and in good faith abandoned by the defendant, and that Gleason was not at that time in danger of being robbed, and, by the conduct of the defendant, Mr. Gleason understood these facts, and that if Mr. Gleason afterwards assaulted the defendant in such a way as to induce in the defendant a reasonable belief that he was actually in danger of great bodily harm or of being killed, and if you believe that Mr. Gleason had his gun in his hand or hands and was working with it, and the defendant had reason to believe, and did believe, that Mr. Gleason intended to renew the attack upon him for the purpose of doing him great bodily harm or killing him, then the defendant would be justified in cocking his revolver and preparing to shoot Mr. Gleason in the arm for the purpose of preventing such great bodily harm or killing, and if, while his gun was so cocked and in his hand, the gun in the hands of the defendant was accidentally discharged, either from the conduct of Mr. Gleason, or from any other cause, and Mr. Gleason was killed thereby, then the defendant would not be guilty of murder in the first degree." The court not only refused to give this and all other requests of similar tenor, but failed to charge the jury at all upon the precise subject to which its attention was thus called. While the several requests are subject to criticism because of the manner in which propositions of law are stated therein, still

they sufficiently presented the subject for the court's consideration. It must be assumed, therefore, that the court entertained the view that there was no evidence to warrant such an instruction, the view which seems to be entertained by my Brethren. I am of the opinion, however, that the evidence above referred to, whether true or false, was such as required the submission of the questions whether or not the defendant abandoned his original felonious undertaking and attempted to retreat in good faith, and, if so, whether his intentions in this regard were manifest to those whom he had assailed, to the jury to determine. The credibility of the witness, and the weight to be given to his story in evidence, were also questions within the province of the jury, to be considered in connection with all the other testimony in the case. The prisoner's criminal career and conduct were within their view, and it was for them to decide, under proper instructions, whether his statements were worthy of belief or not.

The case, as has been seen, was tried by the defense on the theory of self-defense, the defendant claiming that the killing was done to save his own life, in an assault made upon him by the deceased persons after the defendant's iniquitous attempt to commit robbery had been voluntarily abandoned, in good faith, to the knowledge of all the parties to the affray. The defense elicited testimony from its witnesses, including the defendant, which it is claimed tended to establish an abandonment and retreat, and, after the evidence was all admitted, it was for the jury to find the facts, and the court could only consider them, as claimed, for the application of the law to them contingently, if found. This is certainly true where the facts are not admitted, and where, as here, the truth of the testimony is seriously doubted. Therefore,

"Where evidence is offered by either party to prove a certain state of the facts, and the claim is made that they are proved, and the court is requested to charge the jury that the law is as applicable to them, and what verdict to render if they find them proved, the court must comply." (*Mor-*

ris v. Platt, 32 Conn. 75; 11 Ency. Pl. and Pr.,
213, 214.)

Weakness of the evidence is no ground for refusal to
charge upon it. If there is any evidence, however slight,
which supports the hypothesis upon which the request to
charge is based, the request, or an instruction on the court's
own motion, should be given. (11 Ency. Pl. & Pr. 215-217;
Riedle v. Mulhausen, 20 Ill. App. 68; Chapman v. McCor-
mick, 86 N. Y. 479; Muldowney v. The Ill. Cent. R. R. Co.,
32 Iowa 176; Levy v. Gray, 56 Miss. 318; County of Cook
v. Harms, 108 Ill. 151; State v. Levigne, 17 Nev. 435, 30
Pac. 1084; Davis v. Russell, 52 Cal. 611, 28 Am. Rep. 647;
People v. Taylor, 36 Cal. 255.)

Although the prisoner shows, by his own evidence, that he
is guilty of an attempt to perpetrate a heinous offense, for
which, in any event, he is liable to punishment, and while
under the law the assailed would have been justified in killing
him in his attempt, if necessary to prevent him from accom-
plishing his criminal purpose, still, if, before completion, he
in good faith abandoned his evil design, and his abandonment
and retreat were made so obvious by his acts and the circum-
stances as to clearly advise the assailed that they were no
longer in danger of having the attempt renewed, then if there-
after the assailed, not atempting to effect an arrest, made
such a fierce attack as to induce in him a well-grounded be-
lief that they intended to kill him, he had a right to use such
force as was necessary to save his own life, even to the extent
of killing his assailants; and if the jury should find that, at
the time of the homicide, such circumstances actually existed,
then the prisoner would not be guilty of murder in the first
degree, notwithstanding his original criminal assault.

That the plea of self-defense, or of necessity, may become
a shield, even to an original assailant, was announced by
Lord Hale, and is doubtless the doctrine of modern author-
ity. Lord Hale said:

"Suppose that A. by malice makes a sudden as-
sault upon B., who strikes again, and, pursuing

hard upon A., A. retreats to the wall, and in saving his own life kills B.; some have held this to be murder, and not *se defendendo,* because A. gave the first assault. But Mr. Dalton thinketh it to be *se defendendo,* though A. made the first assault, either with or without malice, and then retreated. It seems to me if A. did retreat to the wall upon a real intent to save his own life, and then merely in his own defense killed B., that it is *se defendendo.* But if, on the other side, A., knowing his advantage of strength, or skill, or weapon, retreated to the wall merely as a design to protect himself under shelter of the law, as in his own behalf, but really intending to kill B., then it is murder or manslaughter, as the circumstances of the case require." (1 Hale's P. C., 479, 480.)

Speaking of this species of homicide, Sir William Blackstone says:

"If the slayer has not begun the fight, or (having begun) endeavors to decline any further struggle, and afterwards, being closely pressed by his antagonist, kills him to avoid his own destruction, this is homicide excusable by self-defense. For which reason the law requires that the person who kills another in his own defense should have retreated as far as he conveniently or safely can, to avoid the violence of the assault, before he turns upon his assailant; and that not factitiously, or in order to watch his opportunity, but from a real tenderness of shedding his brother's blood." (4 Bl. Com., 134.)

In 1 McClain, Crim. Law, section 310, it is said:

"One who voluntarily enters into a combat or is the original aggressor cannot excuse a subsequent homicide, committed in consequence thereof, on the ground of self-defense, it being his duty to withdraw; but there must be allowed room for repent

ance ·and abandonment, and if the defendant,
though originally in the wrong, does thus abandon
his purpose, he may afterwards exercise the right
of self-defense. The withdrawal, however, must be
in good faith. If the original assailant merely
ceases to advance for the purpose of· watching his
opponents movements, and without attempting to
avoid the encounter, he will not be excused for
what he afterwards does on the ground of self-de
fense."

Mr. Bishop, in his work on Criminal Law, after an able
examination of this subject, and, as appears, agreeing with
the opinion of Lord Hale, states his conclusion thus:

"This space for repentance is always open. And
where a combatant in good faith withdraws as far
as he can, really intending to abandon the conflict,
and not merely to gain fresh strength or some new
advantage for an attack, but the other will pursue
him, then, if taking life becomes inevitable to save
life, he is justified." (1 Bish. Crim. Law, sec.
871.)

In *Stoffer v. State,* 15 Ohio St. 47, 86 Am. Dec. 470,
where the defendant was originally in the wrong, having
made an assault upon one Webb with intent to murder him,
but then desisted from the conflict, declined further combat,
and retreated, whereupon Webb and another pursued him,
and in the conflict which immediately ensued the defendant
killed Webb, Mr. Justice Ranney, speaking of a defendant
in such a case, said:

"While he remains in the conflict, to whatever
extremity he may be reduced, he cannot be excused
for taking the life of his antagonist to save his own.
In such case it may rightfully and truthfully be
said that he brought the necessity upon himself by
his own criminal conduct. But when he has suc-
ceeded in wholly withdrawing himself from the con-
test, and that so palpably as at the same time to

manifest his own good faith and to remove any just apprehension from his adversary, he is again remitted to his right of self-defense, and may make it effectual by opposing force to force, and, when all other means have failed, may legally act upon the instinct of self-preservation, and save his own life by sacrificing the life of one who persists in endangering it."

So in *People v. Wong Ah Teak,* 63 Cal 544, Mr. Justice Sharpstein said:

"A person who has sought a combat for the purpose of taking advantage of another may afterwards endeavor to decline any further struggle, and, if he really and in good faith does so before killing the person with whom he sought such combat for such purpose, he may justify the killing on the same grounds as he might if he had not originally sought such combat for such purpose."

Nor is, in such cases, where the defendant makes the first assault, the right of self-defense limited to cases where there are two or more assaults in the affray.

In *People v. Button,* 106 Cal. 628, 39 Pac. 1073, 28 L. R. A. 591, 46 Am. St. Rep. 259, the defendant had assaulted the deceased in the first instance, and the trial court instructed the jury, among other things, that if they found from the evidence

"that after the first assault had ceased, and there had an interval elapsed between said first assault and the final assault, making said assaults respectively, although in some degree related to each other, yet substantially distinct transactions, each attended with its own separate circumstances, the deceased procured his gun and made such an attempt to shoot defendant as gave the defendant reasonable ground to apprehend and fear that the deceased was about to take his life, and that, acting under

such reasonable apprehension alone, the defendant
shot the deceased, then you will acquit the defend-
ant."

The Supreme Court of California, holding such charge
erroneous, said:

"It deprived the defendant of the right to go be-
fore the jury upon the plea of self-defense, if there
was but one assault which led up to the homicide.
The right of the defendant to act in self-defense
was in no way dependent upon the commission of
two assaults. If there was but one assault which
caused the combat, and was made by the defendant,
still he had the right of self-defense if his subse-
quent conduct was such as to indicate .to the as-
saulted party that he had withdrawn in good faith
from the struggle. The effect of the modification
was to plainly intimate to the jury that, if the whole
affray was but one connected quarrel or altercation,
then the defendant, under no possible set of circum-
stances, could be justified in law in killing his ad-
versary. This is wrong. As to the true solution of
the question by the jury which the court was then
discussing, it was entirely immaterial whether or
not there was one or two assaults."

(1 Whart. Crim. Law, sec. 486; 1 Bish. Crim. Law, secs.
871-874; 25 Am. and Eng. Ency. Law, 270-271; *People v.
Button,* 106 Cal. 628, 39 Pac. 1073, 28 L. R. A. 591, 46 Am.
St. Rep. 259; *State v. Rogers,* 18 Kan. 78, 26 Am. Rep. 754;
*Parker v. State,* 88 Ala. 4, 7 South. 98; *State v. Smith,* 10
Nev. 106; *State v. Cable,* 117 Mo. 380, 22 S. W. 953; *Peo-
ple v. Robertson,* 67 Cal. 646, 8 Pac. 600; *State v. Edwards,*
112 N. C. 901, 17 S. E. 521.)

It seems that the trial court recognized the fact that the
question of abandonment by the defendant of his intent to
rob exists in the case, for after defining robbery, and stating
the law relating to the right of the person against whom an
attempt to rob is made to arrest the robber and prevent his

escape, and after stating the consequences which follow when such criminal resists arrest, or attempts to escape, and in so doing injures or kills the person who tries to arrest him or prevent his escape, it charged the jury that "if the person attempting to perpetrate such robbery in good faith abandons such attempt before the robbery is accomplished, and desists from further prosecuting the same, and when called upon surrenders himself and makes no effort to escape, the person against whom the attempt is made is not justified in killing or attempting to kill him, or in using more force than is necessary to arrest him or prevent his escape." While the court thus recognizes and endeavors to charge on the question, there is clearly nothing in this instruction that indicated to the jury what the rights of the defendant were, if they found from the evidence that he had in good faith abandoned his design to rob, before the fatal shooting.

I am of the opinion that the questions of abandonment in good faith by the prisoner of his original felonious purpose, and of retreat, ought to have been properly submitted to the jury, and that, under the evidence contained in the record, the court had no right to refuse to submit to the jury the very theory, and the only one, upon which the defense was conducted. Upon this ground only I concur in reversing the judgment.